Catherine Cabalo (SBN 248198)
Khushpreet Mehton (SBN 276827)
PEIFFER WOLF CAR KANE CONWAY
& WISE, LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 766-3592
Facsimile: (415) 840-9435
ccabalo@peifferwolf.com
kmehton@peifferwolf.com

Michelle Uzeta (SBN 164402)
Jillian MacLeod (SBN 352889)
DISABILITY RIGHTS
EDUCATION AND DEFENSE
FUND
3075 Adeline Street, Suite 210
Berkeley, CA 94703-2578
Telephone: (510)-644-2555
muzeta@dredf.org
jmacleod@dredf.org

*Attorneys for Plaintiffs Jake Bertellotti
and Taylor Carty*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAKE BERTELLOTTI and TAYLOR CARTY,<br><br>      Plaintiffs,<br><br>      v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; MICHAEL V. DRAKE, M.D., President of the University of California, in his official capacity; JULIO FRENK, Chancellor of the University of California, Los Angeles, in his official capacity; and DOES 1-10,<br><br>      Defendants. | Case No.<br><br>Civil Rights<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES FOR VIOLATION OF:**<br><br>1. Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12131, *et seq.*) (Emergency Management);<br>2. Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12131, *et seq.*) (Program Access);<br>3. Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12132, 12143) (Paratransit Services);<br>4. Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794);<br>5. Federal Fair Housing Amendments Act (42 U.S.C. §§ 3601 *et seq.*);<br>6. California Gov't Code § 11135; and<br>7. Fair Housing and Employment Act (Cal. Govt Code §§ 12955 *et seq.*)<br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 3

PARTIES ............................................................................................................... 3

FACTUAL ALLEGATIONS ............................................................................... 4

    EXPERIENCES OF PLAINTIFF JAKE BERTELLOTTI .................................. 5

        UCLA Has Failed to Provide Access to Disability Specific Emergency Evacuation Protocols and Evacuation Chairs. ............................................ 6

        UCLA Has Failed to Make Reasonable Accommodations for Jake's Disabilities. ................................................................................................ 10

            *Requests to Be Placed in a Ground-Floor Dormitory* ....................11

            *Requests for Accessible Seating Locations and Furniture in Classrooms* .................................................................................12

            *Requests to Locate Accessible Entrances to Facilities, or Provide Access to Inaccessible Buildings Through Other Means*...............15

            *Requests to Locate and Maintain Accessible Paths of Travel to Classes* ........................................................................................19

            *Requests for CAE to Identify Classes in Accessible Facilities* .......22

            *Requests to Locate and Maintain Accessible Paths of Travel to Dormitories and Accessible Features in Dormitories* ...................23

            *UCLA's Failure to Accommodate was Knowing and Well Documented: Jake and His Parents Met with UCLA Representatives Multiple Times* ...............................................................................25

        UCLA Has Failed to Provide Comparable Paratransit Services............... 27

        UCLA Has Failed to Provide Adequate Signage...................................... 29

    EXPERIENCES OF PLAINTIFF TAYLOR CARTY ....................................... 29

i

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

UCLA Has Failed to Provide Accessible Housing and Significantly
Delayed Provision of Reasonable Modifications: Weyburn Terrace Palm
Apartments ........................................................................ 30

UCLA Has Failed to Provide Access to Academic Buildings and Facilities:
Center for Health Sciences Entrance, Bathrooms and Library ................ 33

UCLA Has Failed to Provide Disability Specific Emergency Evacuation
Protocols and Evacuation Chairs: Weyburn Terrace Palm Apartments ... 35

UCLA Has Failed to Provide Disability Specific Emergency Evacuation
Protocols and Evacuation Chairs: CHS Building ..................................... 36

Taylor's Experience as a Teaching Assistant Confirms Lack of Training of
UCLA Personnel on Assisting Disabled Students During Emergencies.. 40

FIRST CAUSE OF ACTION: VIOLATION OF TITLE II OF THE ADA - Denial of
Access - Emergency Management Services, Program and Activities........................... 41

Requirements for Emergency Management Services, Programs, and Activities 43

Defendants' Failure to Make UCLA's Emergency Management Services,
Programs, and Activities Accessible to People with Disabilities....................... 44

*Preparation: UCLA Fails to Include and Account for People with
Disabilities in Emergency Management Plans and Policies* ................... 44

Failure to create and implement a comprehensive plan that includes
and accounts for the needs of people with disabilities ................. 45

Failure to prepare and train faculty and staff to assist in evacuating
people with disabilities during an emergency ............................... 48

Failure to prepare people with disabilities for an emergency
evacuation ............................................................... 49

*Testing of Preparedness: UCLA Fails to Include People with Disabilities
in Emergency Management Drills and Testing* ........................................ 51

ii
COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

*Notification: UCLA Fails to Notify People with Disabilities of Emergency
Planning Resources and Programs That Are Accessible* ........................52

*Community Evacuation: UCLA Fails to Provide Safe Evacuation Options
for People with Disabilities* ........................................................53

SECOND CAUSE OF ACTION: VIOLATION OF TITLE II OF THE ADA - Denial of
Program Access..........................................................................56

Failure to Ensure the Accessibility and Usability of UCLA's Facilities ........... 56

*Existing Facilities* .....................................................................57

*New Construction and Alterations* ............................................61

Failure to Maintain ...................................................................... 62

Failure to Provide Information / Signage .......................................... 64

Failure to Make Reasonable Modifications........................................ 65

THIRD CAUSE OF ACTION: VIOLATION OF TITLE II OF THE ADA – Failure to
Provide Comparable Paratransit Services........................................... 68

FOURTH CAUSE OF ACTION: VIOLATION OF SECTION 504 OF THE
REHABILITATION ACT ............................................................... 71

FIFTH CAUSE OF ACTION: VIOLATION OF THE FAIR HOUSING
AMENDMENTS ACT ..................................................................... 73

SIXTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA GOVERNMENT
CODE 11135................................................................................ 76

SEVENTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA FAIR
EMPLOYMENT AND HOUSING ACT .............................................. 77

PRAYER FOR RELIEF ................................................................. 79

Plaintiffs Jake Bertellotti and Taylor Carty hereby complain of Defendants Regents of the University of California; Michael V. Drake, M.D., President of the University of California, in his official capacity; Julio Frenk, Chancellor of the University of California, Los Angeles, in his official capacity; and Does 1-10 and allege as follows:

## INTRODUCTION

1.    Plaintiffs Jake Bertellotti and Taylor Carty (collectively "Plaintiffs") are disabled students enrolled at the University of California, Los Angeles ("UCLA"). They bring this action to challenge the failure of the Defendants Regents of the University of California, President of the University of California and Chancellor of UCLA (collectively "Defendants") to remove the architectural and policy barriers that prevent them from having access to a variety of the programs, services, and activities offered at UCLA, including academic programs, residential housing programs, shuttle services, and emergency management services, programs, and activities.

2.    UCLA publicly presents itself as a University that cares about disability rights. For two decades it has offered a Disability Studies minor, and in the 2023 Fall Quarter, the campus launched a new Disability Studies interdepartmental major — the first such major at any California public university. As stated in a flyer for the Disability Studies program, "Through innovative coursework and community partnerships, UCLA has begun to shape future leaders and change-makers who are reimagining services, eliminating barriers, and creating inclusive practices that are transforming the landscape for people with disabilities."

3.    UCLA is also poised to welcome athletes from around the globe during the 2028 Summer Olympic and Paralympic Games. According to UCLA's Housing and Hospitality team's website regarding the Games: "With the nation's top university dining programs and fully-accessible, modern residences, the world's most exceptional athletes will be well fed and well rested as they prepare to compete in this international competition. UCLA's centrally-located campus in Los Angeles will serve as the

Olympic and Paralympic Village. Athletes and support personnel will eat, sleep, and train at UCLA – a mini-metropolis complete with services and amenities designed to make it feel like home to all who will be visiting."

4.    Despite actively marketing itself as a transformative, disability-conscious, accessible, and inclusive institution, UCLA's campus and programming are replete with architectural and policy barriers that violate the mandates of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Federal Fair Housing Amendments Act ("FHAA") and related state law (collectively, "Disability Laws"). Plaintiffs regularly encounter these barriers; they deny them meaningful access to campus, academic classrooms, housing, and other programs.

5.    Although UCLA has a Center for Accessible Education ("CAE")—whose mission is "to create an accessible, inclusive, and supportive learning environment" for disabled students through the provision of "disability-related information" and "expertise in determining an implementing appropriate and reasonable accommodations for academics and housing"—the CAE has been of no help to Plaintiffs. Indeed, Plaintiffs have complained to CAE and other UCLA representatives on numerous occasions about the pervasive barriers they have encountered on campus to no avail.

6.    Plaintiffs have also requested that various disability accommodations be provided to allow them meaningful access to UCLA's services, programs, and activities, but their requests have been ignored or ineptly addressed. Plaintiffs have been frustrated and inconvenienced by UCLA's ongoing lack of accessibility and failure to accommodate. They have been forced to develop burdensome workarounds to access their academic and housing programs, have been prevented and deterred from accessing certain facilities on campus, and in several instances have been placed in physical danger due to UCLA's persistent access barriers.

7.    A particular concern of Plaintiffs is Defendants' failure to develop and implement an emergency management plan that considers their needs as disabled

people. Although Defendants have developed some emergency management plans for UCLA, these plans fail to consider or address the specific needs of disabled individuals like Plaintiffs. As a result, Plaintiff have been effectively excluded from UCLA's emergency management services, programs, and activities, face ongoing discrimination, and are disproportionately at risk of harm, including death.

8. By failing to remediate architectural barriers, modify discriminatory policies, practices and procedures, and address the needs of people with disabilities in its emergency management plans, Defendants have violated, and continue to violate, basic requirements under the Disability Laws.

9. This Complaint seeks declaratory and injunctive relief to remedy Defendants' unlawful policies and practices, and damages to address Plaintiffs' harms. The architectural and policy barriers at UCLA must be remediated so that Plaintiffs have meaningful access to the programs, services, and activities offered at UCLA.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (a)(4) for violations of the ADA, Section 504 and the FHAA.

11. Pursuant to pendant jurisdiction, attendant and related causes of action arising from the same facts are also brought under California law, including California Government Code § 11135; and California's Fair Housing and Employment Act (Cal. Gov't Code § 12955 *et seq.*).

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). The primary real property which is the subject of this action is in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' causes of action took place within this District.

## PARTIES

13. Jake is an individual and resident of California.

14. Taylor is an individual and resident of California.

15. Defendant Regents is a governmental entity that operates public universities that are part of the University of California ("UC") system, including UCLA.

16. Defendant Michael V. Drake is the President of the UC system ("Defendant President") and is sued in his official capacity.

17. Defendant Julio Frenk is the Chancellor for UCLA ("Defendant Chancellor") and is sued in his official capacity.

18. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1-10 are unknown to Plaintiffs, who therefore sue said Doe defendants by such fictitious names. Plaintiffs are informed and believe, and therein allege, that each of the fictitiously named defendants is in some manner legally responsible for the events and happenings herein referred to, which caused injury and damages to Plaintiffs as herein alleged. Plaintiffs pray leave of Court to amend this Complaint to show such true names and capacities when the same have been ascertained.

19. Plaintiffs are informed and believe, and on such information allege, that at all times mentioned here, Defendants, and each of them, were the agents, servants, employees, and representatives of each of the other Defendants, and performed all acts and omissions stated here within the scope of such agency or employment or representative capacity, and/or as part of a joint venture and common enterprise with one or more of the other Defendants, and are responsible in some manner for the acts and omissions of the other Defendants in proximately causing the damages complained of here. All actions alleged herein were done with the knowledge, consent, approval and ratification of each of the Defendants here, including their managing agents, owners, and representatives.

## FACTUAL ALLEGATIONS

20. Defendant Regents is the governing board of the University of California, which includes UCLA, located at 405 Hilgard Avenue in the City of Los Angeles.

21.     Among its many responsibilities, the Regents performs long-range planning for all UC campuses and locations, including UCLA; establishes university policy to help ensure compliance with applicable laws and regulations; governs the physical planning, design, construction, operation, and maintenance of the university's facilities; and approves the university's budget and capital projects. At all times relevant to this Complaint, Defendant Regents was and is the owner, operator, lessor, and lessee of the businesses, properties, facilities and/or portions thereof of the UCLA.

22.     At all times relevant herein, Defendant President has had the authority and responsibility to take whatever actions are necessary for the appropriate functioning of each UC campus, which include adopting and overseeing the implementation of all policies at UCLA. Those policies include, *inter alia*, policies for ensuring the accessibility of the programs, services, and activities of UCLA and the provision of reasonable accommodations to disabled students.

23.     Since January 1, 2025, Defendant Chancellor has had the authority and responsibility to take whatever actions are necessary for the appropriate functioning of UCLA, which include adopting and overseeing the implementation of all policies for the campus. Those policies include, *inter alia*, policies for ensuring the accessibility of the programs, services, and activities of UCLA and the provision of reasonable accommodations to disabled students.

**EXPERIENCES OF PLAINTIFF JAKE BERTELLOTTI**

24.     Jake is enrolled as an undergraduate student at UCLA.

25.     Jake was diagnosed with Duchenne Muscular Dystrophy as a child. DMD causes muscle weakness and limited mobility: Jake is unable to walk or stand unassisted and uses a power-assisted manual wheelchair for navigating the world. Jake is unable to use portions of public facilities that are inaccessible to wheelchair users. He does not have a personal assistant.

26.     Jake is entitled by permit from the State of California to park any vehicle

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

that he drives or in which he is transported in a designated and properly configured disabled accessible parking space. Jake requires parking spaces that are properly accessible, located on an accessible route, and proximate to the public entryways to public facilities that he uses.

27.    Jake was very excited to be accepted to UCLA, one of the best schools on the west coast, if not in the entire country. Both Jake's Mom, Wendy Bertellotti ("Wendy") and Dad, Jason Bertellotti ("Jason") are UCLA alumni. They met while they were students at UCLA and were also very excited for Jake to attend their alma mater.

28.    Jake is currently in his third year of an anticipated four-year Bachelor of Sciences degree in Applied Mathematics and Sciences. He is looking at several graduate programs at UCLA after he completes his undergraduate degree. He would prefer to stay at UCLA for graduate school because of the convenience of already being there and because UCLA has renowned graduate programs generally.

29.    Jake is a stellar student, loves learning, and often goes above and beyond his coursework because of a genuine interest in different subjects. In his free time, which admittedly he does not have a lot of as an undergraduate at UCLA, Jake is interested in gaming and loves swimming.

30.    Jake is an active and involved student and campus resident. In addition to carrying a challenging course load each academic quarter, he has an on-campus job at learning centers in various dormitories.

**UCLA Has Failed to Provide Access to Disability Specific Emergency Evacuation Protocols and Evacuation Chairs.**

31.    Jake has lived in on-campus UCLA student housing for all his years as a student at UCLA. As a wheelchair user, Jake has experienced significant stress and anxiety about how he will evacuate a building in response to an emergency.

32.    If there were an emergency like an earthquake or fire that caused debris to fall in paths of travel, made the ground uneven, or caused elevators to stop working,

Jake would be unable to use his wheelchair to evacuate. He would need to be pushed in an emergency evacuation chair to escape from a hazardous environment because his wheelchair cannot go over significantly uneven surfaces, cannot be easily lifted over debris, and cannot be carried up or down stairs due to its weight. In an active shooter situation or other situation where students are required to evacuate, Jake would benefit from an evacuation chair. An evacuation chair is a lightweight, easily portable wheelchair that is usually pushed by another person.

33.     Every year he has been a student at UCLA, Jake has asked UCLA representatives from various departments, including but not limited to CAE and Residential Life office ("Res Life"), for information regarding the protocols for emergency evacuation and response for him and whether evacuation chairs are available in buildings on campus (both student housing and classrooms). Despite Jake's repeated requests for information, UCLA has **never** provided him with clear or consistent information regarding what he should do in the event of an emergency, and UCLA has failed to collaborate with Jake to create an individualized plan for him to safely evacuate his dormitory in an emergency.

34.     At beginning of Jake's freshman year in Fall Quarter 2022, Jake realized very quickly that he could not meaningfully participate in emergency evacuation drills. During such drills, elevators would be covered by "fire doors" to prevent people from using the elevators. UCLA never advised Jake of how he should safely evacuate from buildings. As a result, when there were evacuation drills in his buildings, Jake would maneuver in his wheelchair with great difficulty to pull open the fire doors, get into the elevator, and then ride down to the first floor and do his best to push open the fire doors to exit. He was scared the elevator would stop working or the doors would be locked when he got to the bottom floor, but he was able to get himself out. Upon getting out, he would make his way out of the building and would have to wheel himself a long distance to the location where students were gathered. On one occasion, a firefighter saw Jake and invited him to wait with him instead of traveling the long distance to meet

up with the other students. No one from UCLA supported Jake or informed him of the protocol that he should follow in these emergency situations. Jake was left to fend for himself, and no one ever approached him or alerted him of the emergency plan for wheelchair users.

35.    After these experiences, Jake and Wendy continued to follow up with the UCLA representatives to get information about evacuation policies for wheelchair users like Jake. The following academic quarter, Winter Quarter 2023, Wendy received an email from the Director of CAE, Spencer Scruggs. Mr. Scruggs notified Wendy that UCLA's "standard protocol is for students using wheelchairs to wait in a stairwell on their floor" where emergency responders would be responsible for helping the student exit the building. However, Mr. Scruggs did not explain where Jake should wait in the stairwell to avoid being in the way of other people evacuating or how emergency responders would know where Jake is located in the building and awaiting assistance with evacuating. Upon information and belief, at the time and to present, UCLA does not have a register of mobility-disabled individuals by building so that emergency responders will know when someone will need assistance to be evacuated.

36.    Mr. Scruggs' email also noted, "[t]he university is working on centralizing some of our existing emergency resources for individuals who use wheelchairs or have other physical disabilities." Jake and his parents were unnerved by Mr. Scruggs' email that confirmed UCLA did not have any policies to include wheelchair users in its emergency planning. Jake continues to live in fear that he will perish in the event of an emergency because UCLA clearly does not know how to evacuate him safely.

37.    Similarly, UCLA representatives responsible for student housing also do not know the protocols for wheelchair users to evacuate dormitories. For example, on January 30, 2023, Jake met with a UCLA campus Housing Director, Ruben Cervantes-Garibay, to address Jake's concerns about evacuation and emergency planning. Mr. Cervantes-Garibay indicated that there was no way to know what to expect in an earthquake, so they couldn't plan ahead of time in terms of a comprehensive evacuation

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

plan. Other than telling Jake to wait in the stairwell where other students would also be exiting the building in the event of an evacuation, Mr. Cervantes-Garibay did not provide Jake with any other details about how to ensure he would be able to evacuate safely or how emergency responders would know to help him exit from his floor.

38.    Additionally, none of the UCLA representatives Jake spoke to understood what an evacuation chair was, if any buildings on campus had evacuation chairs, or if anyone was trained on how to use evacuation chairs. During his January 30, 2023 meeting with Mr. Cervantes-Garibay, Jake shared that he saw what looked like an evacuation chair in the laundry room of his dormitory. Mr. Cervantes-Garibay responded that he was not aware of this chair but would look into it. Jake was surprised that the head of residential life for all De Neve dormitories did not know about evacuation chairs in his building. Jake and his family were referred to Mr. Cervantes-Garibay's supervisor, Monica Hanna, who noted that an evacuation chair had been placed at the front desk of De Neve and that anyone could use it. However, Ms. Hanna did not confirm whether De Neve front desk staff (who are primarily student employees that rotate often) are trained in how to use the evacuation chairs at all, much less how to use the evacuation chairs safely. Ms. Hanna also did not confirm whether De Neve staff or any UCLA representatives would know how to assist Jake in the event of an emergency.

39.    Jake has never been able to participate meaningfully in emergency drills or practice evacuations while he has been a student at UCLA.

40.    UCLA's disregard for Jake's emergency and evacuation safety as a wheelchair user also extends to other amenities on campus, such as UCLA's Sunset Recreation Family Pool (the "Pool"). Swimming is Jake's primary form of exercise, yet the Pool has been inaccessible to him since he arrived on campus. In Spring Quarter 2024, the mechanism that controls the automatic gate for the Pool malfunctioned and was deemed unfixable. UCLA representatives told Jake that he would need to visit the front desk of the Pool or call ahead, ask for help, and then wait for someone to come

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

and open the gate for him. His access to the Pool was dependent on whether someone
was available to help escort him in and out. When Jake followed this protocol and
called in advance for assistance, no one was aware of this protocol. Jake feared for his
safety if he needed to evacuate the Pool, since he would not be able to exit
independently. Jake complained to UCLA representatives about these issues, and they
responded that there was nothing UCLA could do to fix the gate or address Jake's
safety concerns, reiterating that Jake would need to find an escort to help him enter and
exit the Pool.

41.     Jake continues to fear for his safety in the event of an emergency that
requires evacuation. On October 4, 2024, while sitting in his Latin class, he heard the
alarm go off in the elevator—it sounded like someone may have been stuck in the
elevator and pressed the alarm. Also, during the tragic fires in Los Angeles in January
of this year, Jake experienced severe anxiety about the lack of evacuation protocols for
him, so he left campus to stay with his parents, and missed class for several days as a
result. These recent experiences highlight Jake's constant fear and anxiety that he will
not be able to evacuate a building because UCLA has failed to provide him information
on exactly what to do in the event of an emergency, has failed to include him in
emergency drills meaningfully, and has no comprehensive plan in place for keeping
disabled students safe and evacuating them during an emergency. UCLA's failures
result in Jake being at increased risk of injury and death during an emergency.

**UCLA Has Failed to Make Reasonable Accommodations for Jake's
Disabilities.**

42.     From the moment Jake arrived on the UCLA campus in July 2022 for a
summer program before the start of his freshman year, Jake realized he would be forced
to navigate numerous physical barriers on campus and that UCLA representatives
would not be helpful in accommodating him. Many buildings that house classrooms do
not have wheelchair accessible entrances or accessible paths of travel to building

entrances. Many classrooms themselves do not have accessible entrances, seating locations, accessible furniture, or accessible paths of travel between them. Many of Jakes classes are in large amphitheater style lecture halls that have stairs and steep slopes that do not allow Jake access. Undergraduate student housing is located at the top of a huge hill that is too steep for wheelchair users. Construction projects often eliminate the only accessible route Jake has between his classes and dormitory. In all of these instances, Jake has repeatedly asked UCLA representatives for reasonable accommodations to allow him to navigate barriers and/or find alternatives to help him access his classes, dormitory, and other amenities or activities on campus. In response, UCLA has either ignored Jake's requests or failed to provide reasonable accommodations.

43.     When responding to Jake's requests for reasonable accommodations, CAE officials and other UCLA representatives demonstrate their ignorance of what is necessary to remove barriers and allow access for a wheelchair user like Jake, and they have "passed the buck" to other departments who also have no idea how to make the requested accommodations requested. Jake's experiences confirm that UCLA has no policy or process in place for evaluating and granting requests for reasonable accommodations. Instead, the departments that handle such requests do not know how to facilitate access, and do not communicate with each other to ensure such requests evaluated promptly, efficiently, and effectively. As a result, Jake's requests for reasonable accommodations have been ignored, denied without justification, or processed inappropriately.

### Requests to Be Placed in a Ground-Floor Dormitory

44.     Because of his anxiety about being able to evacuate his dormitory room, Jake made multiple requests to be placed in a ground-floor dormitory room. However, leading into Winter Quarter 2023, UCLA failed to process Jake's accommodation request. Mr. Cervantes-Garibay told Jake his request to be placed in a ground-floor dormitory was not granted because CAE had not communicated to UCLA Housing that

Jake was a wheelchair user, despite Jake's registration with CAE as a wheelchair user.
Jake experienced extreme distress and fear during Winter Quarter 2023 because he was
placed in a dormitory on an upper floor that required an elevator to exit during an
emergency.

### *Requests for Accessible Seating Locations and Furniture in Classrooms*

45.    Every academic quarter he has been at UCLA, Jake has tried to work with
CAE to ensure he has an accessible seating location and furniture in his classes and an
accessible route to get from the classroom entrance to the accessible seating/furniture.
In almost every instance where Jake has tried to inspect his anticipated classes with Mr.
Scruggs prior to the start of an academic quarter, Mr. Scruggs has come unprepared to
open any classroom doors, rendering the inspections useless. Jake has specifically
outlined his needs and has requested that CAE ensure his classrooms are physically
accessible to him, but at the beginning of every quarter, Jake has found himself without
accessible furniture or even a place to safely situate his wheelchair during class. In
some instances, at risk to his physical safety, Jake has been forced to move furniture on
his own to create a space for him to attend class.

46.    After struggling with the lack of accessible seating and furniture in
classrooms for the entirety of his freshman year, and before the start of Jake's
sophomore year in Fall Quarter 2023, Jake reached out via email to Patti Alaniz-Roux
at CAE to confirm whether there would be accessible entrances to and seating for his
Fall Quarter 2023 classes. Ms. Alaniz-Roux wrote back on or about August 14, 2023, to
tell Jake that he would be responsible for ensuring he had access to his classes on his
own:

> "I know last quarter was challenging with figuring out how to
> enter the classroom – I am sorry this happened! Please know
> CAE does its best to support you in physically navigating
> campus; however, we do not have the staff capacity to visit
> physical campus spaces on behalf of students. We encourage
> and expect students to take initiative and try to physically
> access the spaces they will be in before classes start – I've had

students in similar situations navigate campus, and the classrooms a week before classes start."

The message to Jake was clear: UCLA would not help him navigate the numerous physical barriers in classrooms and across campus so that he could access his classes—he must fend for himself.

47.    Despite Ms. Alaniz-Roux's email, Jake did his best to contact CAE in advance of the start of each quarter to ensure he would have accessible seating and furniture. However, obtaining and placing accessible furniture for classes has been unnecessarily complicated because *three different UCLA departments* must evaluate and process Jake's requests. These departments do not understand accessibility requirements under Disability Laws and do not properly communicate with each other. Although Jake has been directed to lodge requests for accessible furniture and seating locations in classrooms with CAE, CAE does not order accessible furniture—UCLA's Facilities Management does. And not only is the ordering of furniture out of CAE's control, but the *placement* of accessible furniture is also out of CAE's control—such placement of furniture is handled by Res Life. UCLA representatives confirmed that this practice has been the case "for at least a decade."

48.    In several instances where CAE has provided Jake with "accessible" furniture in his classrooms, they have failed to ensure the furniture is useable by Jake. For example, in one of Jake's lecture halls—Rolfe Hall 1200—an "accessible" desk was bolted into the floor at a severe slope, rendering it useless (and dangerous) to any wheelchair user:

//

//

//

//

//

13
COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*



49.    Jake has experienced numerous other problems with UCLA's failure to reasonably accommodate his need for accessible furniture in classrooms and an accessible route to get to the accessible furniture, including without limitation, the following:

   a.    UCLA placed an accessible desk at the front (bottom) of an amphitheater-style lecture hall, but CAE told Jake to use an accessible entrance at the back (top) of the lecture hall, so Jake had no way to get to the accessible desk because it was located at the bottom of a set of stairs.

   b.    UCLA placed an accessible desk directly under the whiteboard for a classroom, where the user would be unable to see the whiteboard. Even after addressing this issue with CAE in the beginning of Fall 2024 Quarter, Jake was forced to deal with this issue again recently. On April 2, 2025, just days into Spring Quarter 2025, Jake's Math 151A class was moved from an accessible location to an inaccessible classroom. The only place for accessible furniture in the new classroom is against the whiteboard where the professor is. This experience confirms that UCLA has no reliable process to evaluate and log requests for the accommodation of

accessible furniture to prevent disabled students from being repeatedly forced to encounter barriers and miss class because of inaccessible conditions.

c. UCLA placed an accessible desk in inaccessible area—up a step/level where Jake could not get to it in his wheelchair. The desk was not marked for his use, so other non-disabled students took over the table. Jake was forced to miss several classes as a result.

d. Jake requested accessible desk for his math discussion class in Dodd Hall 146, and Mr. Scruggs told Jake placing the accessible table at the front of class was not possible with the existing tables and furniture because it would impede "traffic out of the classroom and could be a fire hazard." Jake asked Mr. Scruggs why a similar table already at the front of the class couldn't be replaced with an accessible one for his use. Mr. Scruggs did not respond.

50.    For most of the time Jake has been on campus, CAE has failed to respond to Jake's requests to provide accessible seating areas and furniture in a timely fashion, causing him to miss classes because they were inaccessible to him. This experience caused him significant anxiety and stress that he would be penalized for absences or be forced to drop classes.

### *Requests to Locate Accessible Entrances to Facilities, or Provide Access to Inaccessible Buildings Through Other Means*

51.    Jake consistently struggles with accessing his classrooms, because UCLA does not have an accurate campus map that identifies where accessible entrances to buildings are or the location of accessible paths of travel that connect buildings on campus. Jake often encounters doors to buildings and classrooms that are too heavy for him to open on his own and/or that close too fast for him to clear the door in his wheelchair. Jake has made numerous requests to CAE and other UCLA representatives to help him determine where accessible entrances and paths of travel are, but UCLA's

responses to Jake's requests demonstrate that UCLA does not know where its accessible features are located. UCLA has provided Jake with incorrect information many times, leaving him to fend for himself.

52. CAE's ignorance of what is an accessible entrance is perhaps best demonstrated by the below pictured service ramp that CAE told Jake would be the "accessible" entrance to one of his classes located in Franz Hall 1178 during Spring Quarter 2023:



This is not ramp that is safe for wheelchair access. The ramp slope is approximately 21.7%, exponentially more than the maximum 1:12 (8.33%) slope allowed. And no level landing as provided at the top of the ramp to allow a wheelchair user to open the door without rolling backwards down the ramp. Directing Jake to use this ramp was callous and demonstrates UCLA's severe ignorance of what is accessible and safe for students with mobility disabilities.

53. Unable to access his first class in Franz 1178, Jake and his parents immediately contacted Mr. Scruggs for help. Mr. Scruggs responded that **CAE isn't responsible for "hardscapes," can't help with wheelchair ramps, and doesn't vet**

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

**accessibility of classrooms for disabled students** (although that had been done every quarter before for Jake by Kayla Pavlinac, the CAE "Disability Specialist" he was assigned to for these issues and accommodations). Mr. Scruggs was dismissive of the Bertellottis and said he was busy in a meeting and couldn't help Jake rectify his inability to access his class. So, Jake contacted Ms. Pavlinac immediately to avoid missing class. He was told to go to his dorm room and try to attend Ms. Pavlinac's office hours via Zoom for assistance getting into his class which was nearly over at this point. Jake went back to his dorm to attend the office hour as instructed, but he could not get there in time for the office hour window. Due to the inaccessible ramp, Jake was forced to miss four additional classes, including the final day of class when students were reviewing material for the final exam. CAE made no effort to ensure Jake was provided with accommodations for his missed classes beyond a link to class notes.

54.    Exterior doors to buildings are too heavy for Jake to use and do not have automatic door openers. For example, Jake had a class in the Physics and Astronomy Building, which has a primary entrance door that does not have an automatic door opener and is too heavy for him to open on his own. Despite his requests that CAE help him figure out how to access his class in this building, he received no useful assistance and was forced to find a workaround on his own. He ended up using a service alley next to the building that has a ramp presumably for maintenance and facilities management employees to access the building. Upon information and belief, this service alley ramp was not entirely accessible to wheelchair users either, but Jake did his best to utilize the ramp to access the building.

55.    Jake has had several classes where CAE has informed him that the class has a designated "accessible" entrance, but the entrance lacks an automatic door opener and is inoperable for him, meaning someone else will need to open the door for him. In these instances, Jake has been forced to wait outside of the door and hope that someone can hear him knocking or that someone exits the classroom and can let him in. These experiences indicate that CAE inaccurately designates entrances as accessible when

17

COMPLAINT AND JURY DEMAND

*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

they are aware the entrances are not truly accessible.

56.     Even when CAE has promised to have someone specifically assigned to help Jake open a door he cannot independently open, CAE has failed. For example, as noted above, over the course of the Spring Quarter 2023, Jake was locked out of Franz Hall 1178 for his Calculus class five times. Jake waited at the locked door each time he couldn't get in, which was both frustrating and humiliating. A person was assigned to support Jake in getting in the designated "accessible" entrance through the back of the building, but this person did not show up on two occasions. On these occasions, Jake waited for the professor to open the door, but no one did. On the final day of class before the final exam, Mr. Scruggs told Jake *after the start of class* that the person assigned to open the door for Jake was unavailable, but Mr. Scruggs was also unavailable to assist because he was at a dentist appointment. Thus, Jake wheeled himself to a class that Mr. Scruggs knew Jake would not be able to access on his own. Other than providing Jake with access to class notes, CAE made no other accommodations to assist Jake with the classes he missed because he could not physically get into classrooms.

57.     Because of Jake's disabilities, swimming is one of the best forms of exercise for him. However, he has repeatedly been denied access to UCLA's Sunset Recreation Family Pool (the "Pool") because of multiple access barriers, including an entry gate with no automatic door opener that Jake cannot use independently.

58.     During Winter Quarter 2024, Yonit Kovnator, UCLA's ADA/504 Compliance Officer, alerted Jake and Jason that the mechanism that controls the automatic gate for the Pool had completely malfunctioned and was deemed unfixable. She told Jake that he would need to visit the front desk or call ahead, ask for help, and then wait for someone to come to open the gate for him. His access to the Pool was dependent on whether someone was available to help escort him in and out. When Jake followed this protocol and called in advance for assistance, no one was trained or aware of this protocol. Jake also feared for his safety if he needed to evacuate the Pool, since

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

he would not be able to exit independently. Jake complained to Ms. Kovnator about these issues, and she responded that there was nothing UCLA could do to fix the gate or address Jake's safety concerns.

### *Requests to Locate and Maintain Accessible Paths of Travel to Classes*

59.    Jake has encountered numerous barriers in the accessible paths of travel around campus (*e.g.*, pedestrian walkways, sidewalks, curb ramps for wheelchair access, elevators, and lifts) because of as-built conditions, disrepair, a failure to maintain these areas properly, the use of crowd control barriers, construction projects, and weather abatement efforts (*e.g.*, sandbags during rainstorms). In all of these instances, UCLA has not provided Jake with alternative accessible paths of travel. Jake and his parents have alerted UCLA representatives of these barriers that prohibit Jake from navigating campus and have asked that the barriers be removed and paths of travel be maintained to be accessible, or an alternate route be provided, but UCLA has failed to reasonably accommodate Jake's requests.

60.    For example, in his first quarter on campus (Summer Quarter 2022), Jake was denied access to a lecture due to construction work that had demolished a curb ramp and parts of the route to access Jake's classes. Jake was unable to get assistance on this issue from Ms. Pavlinac, so Wendy contacted the Interim Director of CAE, John Bollard, to address the lack of accessible route. In response, Mr. Bollard asked Laura Czajkowski from CAE to address the obstacle, and she said Jake needed to travel up to the next curb ramp. However, the suggested alternative path was also blocked by construction. The barriers were still there when Jake showed up the following class day. Wendy was forced to drive up from San Diego to speak with the individuals who were on campus doing construction, and they promptly addressed the barriers to allow Jake access.

61.    Jake has experienced difficulty navigating curb ramps throughout campus because of various as-built conditions that create barriers to access, including but not limited to curb ramps that are too steep and/or have a severe counter-slopes where the

ramps intersect with the road, which creates the risk that Jake will get his footplate caught at the start of the ramp and he will be thrown from his wheelchair.

62.    Walkways that lead to various entry doors of the Mathematical Sciences Building are too steep for a wheelchair user and exceed the maximum allowed slope. Jake has complained to CAE about inaccessible paths of travel and entrances to the Mathematical Sciences Building, but CAE was not helpful. Jake was forced to find workarounds to access Mathematical Sciences on his own.

63.    Elevators are often out of service without any notice to Jake or alternative paths of travel identified. Jake asked for the reasonable accommodation of being alerted when elevators are out of service and where alternative paths of travel are located. However, Jake has encountered multiple instances where the elevator near the Anderson School of Management building ("Anderson elevator"), which is Jake's accessible route to north campus, was broken and no alternative accessible route was identified.

64.    On or about January 15, 2024, Jake encountered large hoses blocking the access to the Anderson elevator and no directional signage informing him of an alternate route. As directed by UCLA representatives, Jake called Erik Ulstrup, the Assistant Director of UCLA's Facilities Management office, for support. After reporting the barrier, Jake attempted to take an alternative route he found on his own, but he still missed class because he didn't get there in time. Despite Facilities Management knowing of these clear barriers to an integral elevator in one of the only— if not the only—accessible route on the north side of campus, these obstructions continued blocking access for several days—until January 17, 2024.

65.    As a result of Jake's communication with Mr. Ulstrup, on January 16, 2024, Facilities Management installed a plywood "ramp" over the construction wires and hoses for Jake to access to the Anderson elevator. However, the "ramp" was not a compliant ramp for a wheelchair user and was dangerous for Jake to traverse. The makeshift ramp developed a hole in the middle of the ramp where Facilities

Management vehicles would use the ramp, which resulted in additional safety risk for Jake if he attempted to use the makeshift ramp:



66.     During Jake's freshman and sophomore years, the wheelchair lifts in Powell Library that would allow Jake and other people with mobility disabilities to access the main floor of the library from the lobby were marked as not self-operable, yet there were no attendants on site at all times who could assist. Additionally, the lifts looked like they were not maintained, and furniture was often stored in front of the lifts, blocking access. Jake reported these problems to UCLA representatives, who removed the furniture and signs incorrectly describing the lifts as not self-operable. However, the lifts themselves continue to appear unmaintained.

67.     Jake has complained to UCLA about dangerous conditions in pedestrian paths of travel around campus that pose risks to him and other wheelchair users, including but not limited to:

> a.  Rocky ground cover, torn up pavement and cracked tiles around the Inverted Fountain in front of Franz Hall.
>
> b.  Bent drainage grates and drainage grates with holes larger than 1 inch in the direction of travel that are hazards to Jake and other wheelchair users

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

because they are located within main paths of travel.

    c.   Many vertical changes in elevation, holes in cobblestones/tiles, and holes around utility covers throughout paths of travel all over campus.

UCLA has not responded to Jake's complaints about these conditions, and Jake has been forced to navigate around these barriers out of fear his wheelchair wheels may get stuck and he will be thrown from his wheelchair.

68.    Jake also regularly encounters UCLA vehicles blocking main paths of travel, not allowing enough width for wheelchair users to pass:



In these instances, Jake is forced to backtrack and is at risk of missing classes, being late for work, and/or being forced to take an alternative path that is not safe for wheelchair users. Inaccessible paths of travel like those mentioned above have repeatedly prevented Jake from accessing classes, activities, events, services, and programs on campus.

### *Requests for CAE to Identify Classes in Accessible Facilities*

69.    Knowing that many classrooms are not physically accessible to him, Jake has asked for CAE's help to identify classes that are located in accessible buildings and classrooms. However, CAE has repeatedly failed to make this requested accommodation.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

70.    After being forced to drop a music elective class because of multiple physical access barriers at the beginning of Spring Quarter 2024, Jake asked Mr. Scruggs for help finding a different elective. Mr. Scruggs told Jake to contact his academic advisor, however his academic advisor would not be in a position to know what classes are in accessible locations. Mr. Scruggs deprioritized and minimized Jake's request by saying he would "try to follow up with them tomorrow."

71.    Mr. Scruggs ultimately told Jake to handle finding a new elective on his own and to let him know when Jake enrolled in another class. Mr. Scruggs admitted he could not help Jake more swiftly because he could not "say for sure what classes in what classrooms will work for you." Jake explained that he just needed a general education ("GE") class that was accessible to a wheelchair user, and expressed frustration that Mr. Scruggs, the Director of CAE, did not know what classrooms were accessible to wheelchair users. Jake reminded Mr. Scruggs that it was imperative that he find another GE class as soon as possible, because he needed a certain number of units to keep his student loans. Mr. Scruggs replied, "I can do what I can to try to get you into another class, but I have limitations on what I am able to do." Mr. Scruggs' dismissive attitude and incompetence confirmed CAE's and UCLA's continued, systemic disregard for the very students CAE is charged with serving and assisting.

### Requests to Locate and Maintain Accessible Paths of Travel to Dormitories and Accessible Features in Dormitories

72.    Like elevators that allow Jake access to academic buildings, he requires the use of elevators to access student housing. Jake specifically requested the accommodation of being able to use existing elevators to access the dormitories but was simply directed to speak with front desk staff at dormitories—who are mostly student workers and lack the authority or ability to provide the requested accommodation. After pressing the issue, UCLA finally provided Jake with elevator access but has failed to maintain that access. UCLA Facilities Management or UCLA janitorial staff continue to lock the exterior door to the elevator, blocking Jake's access to the elevator.

73.    For example, Jake has repeatedly asked for access to the elevator in Carnesale Commons so that he is not forced to wheel himself up the only alternative route to access dormitories in this area, which is up a steep hill. UCLA representatives initially failed to grant Jake's request for access to this elevator, but after allowing him a keycard to access the elevator, they did not train their staff properly to ensure the door would be unlocked and operable with Jake's keycard. He has been denied access to this elevator numerous times, which left him with no other option but to wheel himself up the steep hills in that area.

74.    In specific example in October 2024, Jake's BruinID card did not allow him access to the Carnesale Commons elevator because the door was manually locked from the inside by staff who did not know of or understand Jake's request for this accommodation. It was getting late, and Jake's wheelchair battery was running out of power, so he attempted to go up the hill to his dormitory. Unfortunately, Jake's wheelchair ran out of battery power, so he was stranded. Luckily, students walking nearby saw Jake and helped push him up the hill to a flat area where he could wheel himself the rest of the way to his room. This experience was dangerous, frightening, and frustrating for Jake.

75.    On or about February 23, 2024, Jake's accessible route from main campus to the dormitories (Charles E. Young Drive West starting from Straus Stadium and the Los Angeles Tennis Center and heading north) was blocked by crowd control barriers placed in the middle of the sidewalk to manage students for the basketball game that Sunday (February 25, 2024). Jake contacted Ms. Kovnator and Mr. Ulstrup to alert them of the barriers and seek immediate assistance. Mr. Ulstrup told Jake that he contacted the recreation department and was told the barriers would need to stay in place and could not be moved, because they were properly placed to allow 36 inches for wheelchairs, but it was not clear that there was at least 36 inches of clear space after the barriers were placed. Jake experienced difficulty returning to his dormitory and missed his next obligation because of this blocked sidewalk. Jason spoke with Mr. Ulstrup,

who said Facilities Management would attempt to adjust barriers. Jake felt extremely frustrated that these barriers continued to be a problem after he and his parents specifically reported and complained about these crowd control barriers in this location multiple times the prior year to UCLA representatives, because they are used for every basketball game. Despite ongoing notice of the barriers and problems for Jake, it was apparent UCLA never alerted or trained its staff how to prevent blocking access to the only accessible route connecting the main campus with undergraduate student housing. The use of crowd control barriers is depicted in the following photo, which does not appear to allow for 36 inches when accounting for traffic and light posts and utility boxes:



### UCLA's Failure to Accommodate was Knowing and Well Documented: Jake and His Parents Met with UCLA Representatives Multiple Times.

76.    Jake's numerous requests for reasonable accommodations as described above are well-documented, starting in April 2023, when Jake and his parents met with Suzanne Seplow (UCLA's Vice Chancellor), Ms. Kovnator, and Mr. Scruggs to review the extreme lack of access Jake experienced on campus. These UCLA representatives ensured the Bertellottis that the following issues would be addressed:

a. Improved signage to ensure Jake could find accessible classroom entrances, however Jake never saw any new signage or a campus map that included accessible entrances;

b. Access to the pool lane closest to the Pool lift, although UCLA representatives made no effort to address the issue of the broken door that did not allow Jake independent access to the Pool;

c. Improvement of continually broken elevators, although Jake's dormitory elevator was shut down without notice on two occasions over the course of the next nine weeks – the elevator was fixed only after the Vice Chancellor was made aware of the situation;

d. Comprehensive evacuation plan to be created and shared with Jake, however Jake was not informed of any plan other than for him to wait in a stairwell;

e. Assignment to the bottom floor dorm for next year with the opportunity to see the room to be sure Jake could easily access it, however, no one from UCLA followed up with Jake to allow him the opportunity to see his next assigned dormitory room in advance of the start of the quarter.

f. Commitment from CAE ensuring that Jake could access his classes for Spring Quarter 2023.

Jake was encouraged to reach out to UCLA's representatives any time he encountered a barrier. He did so for all issues that arose after this meeting, but he never heard back from Ms. Kovnator.

77.     Despite these clear expectations and agreements, UCLA failed to abide by the accommodations approved. As noted above, over the course of the Spring Quarter 2023, Jake was locked out of Franz Hall 1178 for his Calculus class five times, including the final day of class when students were reviewing material for the final exam. Other than providing Jake with access to class notes, CAE made no other accommodations to assist Jake with the classes he missed because he could not

physically get into classrooms.

78.     In or about August 2023, Jake filed a formal grievance with UCLA for the lack of accessibility and continued discrimination on the basis of his physical disability.

79.     On or about September 18, 2023, Jake met with the UC Provost along with eleven (11) other students. During this meeting, Jake was able to share his struggles and the limitations he experienced daily on the UCLA campus because of access issues, including without limitation: problems with elevators being out of service and not maintained, a lack of accessible paths of travel to classrooms and dormitories, a lack of signage marking accessible entrances to buildings and classrooms, the dangers to his health by being forced to traverse up inclines in his wheelchair when accessible paths of travel are not available or are disrupted, a lack of accessible emergency planning and preparedness, and the complete failure of communication and coordination between various departments (including CAE) to address access concerns. No one from the Provost's office ever followed up with Jake.

80.     On October 24, 2023, Jake, Wendy, and Jake's counsel met with Ms. Kovnator regarding Jake's grievance filed in August and the many accessibility barriers he was forced to navigate around consistently throughout campus. Ms. Kovnator responded that she did not have the power to implement any specific changes, and that Jake's concerns would need to be addressed with the specific departments involved. She offered to refer Jake to UCLA's legal department.

**UCLA Has Failed to Provide Comparable Paratransit Services**

81.     BruinAccess Complimentary Paratransit Service. UCLA offers a free, year-round campus transit service called BruinBus, with multiple routes serving campus and Westwood Village. BruinAccess is UCLA's complementary paratransit service. BruinAccess is operated by UCLA Transportation in partnership with CAE and Employee Disability Management Services. BruinAccess is intended to increase accessibility to campus for students with disabilities like Jake.

82.     Jake was found eligible for BruinAccess in the Summer of 2022 when he worked with Ms. Pavlinac at CAE to confirm all of Jake's requested disability accommodations. Unfortunately, since becoming eligible, Jake has attempted to use BruinAccess on multiple occasions but has not been able to secure a shuttle consistently. BruinAccess has been unreliable and useless to Jake as a means to access UCLA's campus in a way comparable to his non-disabled peers.

83.     Beginning in Fall Semester 2024, whenever Jake would attempt to secure a shuttle in advance, the BruinAccess "App" would alert him that it BruinAccess does not take reservations in advance and that it provides only on-demand shuttle services. However, on-demand services are unreliable. For example, on or about February 5, 2025, Jake attempted to reserve a BruinAccess shuttle to get to his Physics discussion group to avoid rain in the area. However, when Jake submitted his "on-demand" request, the App gave him **walking directions** instead with no option to reserve a shuttle and no alternative way to get transportation.

84.     Jake also attempted to reserve a BruinAccess shuttle on February 12 and 13, 2025 when rain returned to the area, but again, the BruinAccess App did not allow Jake to reserve a shuttle and instead, gave him walking directions to get to class. It is dangerous for Jake to attempt to wheel himself around campus with significant rain, so he was forced to miss class on all of these days.

85.     On February 14, 2025, Jake complained about BruinAccess to UCLA Transportation Department and to CAE. To date, he has not heard back from either department. Jake has been prevented and deterred from using BruinAccess because of its constraints and scheduling problems since February 2025. When Jake is faced with inclement weather conditions that make it dangerous for him to wheel around campus, he is forced to miss class, work, and other campus activities.

86.     The problems and difficulties with BruinAccess are longstanding and have been well-documented. See e.g. https://dailybruin.com/2023/05/14/disabled-students-report-chronic-delays-frustration-with-bruinaccess-van-service (May 2023 story in the

Daily Bruin reporting chronic unreliable service and detailing how issues with BruinAccess have prevented students from receiving the same educational opportunities as non-disabled students).

**UCLA Has Failed to Provide Adequate Signage**

87.     Throughout his time at UCLA, Jake has been frustrated by the fact that disability signage in buildings, intended to direct people to accessible features and facilities, is often wrong or confusing. For example, an International Symbol of Accessibility ("ISA") sign in Royce Hall indicating the presence of an accessible route directs people to a set of stairs. As another example, while trying to take a test at CAE's testing center in Murphy Hall during Winter Quarter 2024, Jake discovered that the designated "accessible" toilet in Murphy Hall is not actually accessible to wheelchair users. The height of the toilet was too low, making in dangerous for Jake to even attempt to use. As a result, Jake suffered discomfort and embarrassment.

**EXPERIENCES OF PLAINTIFF TAYLOR CARTY**

88.     Plaintiff Taylor Carty is a graduate student at UCLA. She is currently in her second year of a two-year Master of Public Health program in the Fielding School of Public Health.

89.     Taylor was diagnosed with cerebral palsy spastic quadriplegia as an infant. Due to her disability, she has slow psychomotor speeds, weakness and limited fine motor functioning in her left hand, and slow information processing. Taylor wears a splint on her left hand, and relies on her right hand to write, type, carry things, and do other daily activities. She can walk very short distances with leg braces and a single point cane but primarily uses a power wheelchair for navigating the world. Taylor does not use a personal care attendant.

90.     Due to the weakness in her left hand caused by her disability, Taylor wears a brace on her left hand. In order to open non-automatic doors on her own, she must

hold the door open with her right hand while simultaneously trying to maneuver her power wheelchair into the doorway with her left hand which has limited fine motor functioning. This makes it very difficult for her to open doors without an automatic door opener or assistance from another person.

91.     In 2016, Taylor was involved in an accident that left her with second- and third-degree burns. She spent nearly three weeks in an intensive burn unit recovering. Due to this experience, Taylor is extremely cautious about fire hazards and fearful of being trapped in a fire. It is important for Taylor to have established emergency evacuation plans in place so she knows what to expect and can be reasonable assured that her needs as a disabled person will be met during an emergency.

92.     If there were an emergency like an earthquake or fire that caused debris to fall in paths of travel, made the ground uneven, or caused elevators to stop working, Taylor would be unable to use her walking cane to evacuate. She would need to be pushed in an emergency evacuation chair to escape from a hazardous environment because her power wheelchair cannot go over significantly uneven surfaces, cannot be easily lifted over debris, and cannot be carried up or down stairs due to its weight. In an active shooter situation or other situation where students are required to evacuate, Taylor would benefit from an evacuation chair.

93.     Since moving into student housing and beginning school at UCLA, Taylor has encountered architectural barriers, experienced significant delays and/or non-responses to reasonable accommodation requests, and been denied access to UCLA's emergency management services, programs, and activities.

**UCLA Has Failed to Provide Accessible Housing and Significantly Delayed Provision of Reasonable Modifications: Weyburn Terrace Palm Apartments**

94.     In April 2023, Taylor submitted her housing application and housing accommodations request to UCLA. She was approved for an ADA-accessible housing unit, including a roll-in shower, grab bars in the bathroom, and automatic door openers

in the unit.

95.     Taylor was informed by UCLA Housing Services on July 10, 2023 that all vacant accessible rooms had been offered to other students and that she had been placed on the waitlist. Taylor frantically searched for available, accessible, in-budget, off-campus apartments, to no avail.

96.     On August 7, 2023 Taylor emailed Ms. Kovnator, informing her that she needed accessible housing and would not be able to start school at UCLA without it. On August 15, 2023, UCLA offered her a housing unit on the eighth floor of an off-campus UCLA student housing apartment complex called the Weyburn Terrace Palm apartments. On August 22, 2023, Taylor received an updated offer for a ground floor unit. The contract for the updated offer was formalized on August 31, 2023.

97.     Taylor moved into UCLA student housing on September 15, 2023, and began school at UCLA on September 23, 2023. When Taylor moved in, there was no automatic door opener on the outside of her apartment unit door (meaning that she could only exit but not enter her room without assistance), and there were no grab bars in the shower.

98.     Additionally, the apartment building had no automatic door openers in communal areas, meaning that she was unable to enter or exit the building, the laundry room, and the trash room without significant difficulty or assistance.

99.     Taylor emailed Housing Services immediately upon moving in on September 15, 2023 to request grab bars for her shower and automatic door openers for her room and other doors in the building.

100.    Grab bars were added to Taylor's shower on September 18, and the door opener for the outside of her room was added September 29, 2023. It broke after the first day of use but was fixed by maintenance on October 2, 2023.

101.    An automatic opener was added to the front door of the apartment building in late October or early November of 2023, after Taylor emailed Ms. Kovnator on

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

October 20, 2023, and asked for help with getting her requests completed.

102.    On November 8, 2023, Taylor emailed Housing Services to ask for an update on the installation of automatic door openers for the trash room and laundry room. A Housing Services staff member replied that they hoped to install the openers by mid-December, and in the meantime, Taylor could use door stoppers to prevent the doors from closing on her. This system involved Taylor bringing a UCLA provided door stop with her, placing it under the door herself, and picking up the door stop and taking it with her when she was done. Taylor managed on her own by holding the door open with her wheelchair while pushing the door stop under the door with her right hand.

103.    The automatic door opener for the laundry room was installed in mid-December, nearly three months after Taylor moved in.

104.    After months of correspondence with UCLA Housing Services about installing an automatic door opener for the trash room, the opener was finally installed in early March of 2024, nearly 6 months after she moved in.

105.    On at least three occasions, Taylor was trapped in the trash room after the door swung closed behind her. On two of these occasions, she was able to maneuver herself out with some difficulty, but on one of these occasions she was completely stuck. She was eventually able to push the door open with the back of her wheelchair which caused some damage to her wheelchair. Due to this experience, she had to stop taking the trash out herself and started relying on help from others to take out the trash until the automatic door opener was installed.

106.    During the time that Taylor was waiting for the door openers to be installed throughout the apartment building, she consistently struggled to open doors without assistance and to place the doorstops under the trash room door, or she had to wait for others to open doors for her.

//

**UCLA Has Failed to Provide Access to Academic Buildings and Facilities: Center for Health Sciences Entrance, Bathrooms and Library**

107.    Taylor also experienced inaccessible facilities on the UCLA campus while attending her classes.

108.    All of Taylor's classes are located in the Center for Health Sciences ("CHS") building.

109.    There is no automatic door opener for the CHS building entrance that is across from the botanical garden. Taylor uses this entrance most frequently because it is the most convenient entrance on her route from her apartment to her classes. She has also noticed that more students use this door, so it is easier for her to get help with opening the door. There is an automatic door opener on the other side of the building, but Taylor reports that it was frequently broken last academic year. She submitted multiple work orders for the opener during the 2023-2024 academic term, but she eventually gave up after the doors continued to be broken and inconsistently useable.

110.    Additionally, there are no automatic door openers for the bathrooms or the Louise M. Darling Biomedical Library in the CHS building, meaning that Taylor cannot use these spaces without the help of other students who are not always around to help open doors.

111.    Taylor emailed Ms. Kovnator on January 11, 2024, and asked that automatic door openers be added to the library doors, the first-floor bathroom doors, and the CHS building entrance across from the botanical garden. On January 16, 2024, Taylor received a response from Ms. Kovnator stating "I've forwarded your concerns to our Facilities department who will be looking into what can be done regarding your concerns and requests. Once I have more information from them, I will let you know." Taylor followed up on January 29, 2024, but no update was available.

112.    On February 12, 2024, Taylor reached out again. On February 13, 2024, Ms. Kovnator responded stating that the facilities team was "unable to add automatic door openers at this time" with no further explanation as to why. She informed Taylor

that the pressure had been released from the doors so they would be easier to open and
told Taylor that she would inform her if the door openers could be added at a later date.

113.    Taylor responded via email on February 16, 2024 and informed Ms.
Kovnator that while opening the doors was not impossible, they remained very difficult
for her to open without help. She noted that the entrance doors near the botanical garden
remained particularly difficult. She asked if UCLA could explore other options like
adding a clicker to the doors to make them easier to open.

114.    Ms. Kovnator replied on February 21, 2024 stating: "I am sorry to hear it is
still difficult to open the doors across from the botanical garden. Unfortunately, it may
take a little time to make changes, but let me look into what, if anything, can be done to
assist with opening the door." She asked whether Taylor preferred which doors be fixed
first in the event that the facilities team was able to make changes. Taylor requested that
the entrance doors near the botanical garden be prioritized.

115.    On March 6, 2024, Taylor followed up via email with Ms. Kovnator to
check on the status of the doors in the CHS building. Ms. Kovnator replied the same
day stating "Again, we aren't able to add the automatic door openers at the moment, but
my hope [is that] we will be able to determine some solutions soon. [sic]"

116.    On March 21, 2024, Taylor sent Ms. Kovnator an email inquiring about the
status of the doors. She also asked if there was a reason UCLA could not install the
automatic door openers. Ms. Kovnator did not respond.

117.    As a result of UCLA's failure to add automatic door openers to the CHS
building, Taylor faced inaccessible facilities in the CHS building for 9 months—the
entirety of the 2023-2024 school year.

118.    During this time, Taylor struggled to open doors without assistance any
time she attended classes. She incurred damage to the arm of her wheelchair as a result
of trying to open the CHS entrance doors on her own because her wheelchair would
frequently get caught in the doors as she was trying to maneuver into them.

119.    Also during this time, Taylor often had to go back to her apartment to

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

study or use the bathroom unless another student came by to help her with the CHS library doors or bathroom door. Going home to use the bathroom was not something that she always had time to do between classes.

120.   As of the filing of this complaint, the library doors, first-floor bathroom doors, and the building entrance across from the botanical garden at CHS all still lack automatic door openers and are difficult, if not impossible, for Taylor to open independently. Taylor has still not received any reason for UCLA's refusal to install automatic door openers so she can use these facilities independently and in a manner similar to her non-disabled peers.

**UCLA Has Failed to Provide Disability Specific Emergency Evacuation Protocols and Evacuation Chairs: Weyburn Terrace Palm Apartments**

121.   In January 2024, Taylor began inquiring with several UCLA staff about UCLA's emergency evacuation services, programs, and activities, and specifically, whether emergency evacuation chairs were available for students with disabilities.

122.   On January 11, 2024 Taylor emailed Housing Services asking whether there were any evacuation chairs in her apartment building or nearby. Housing Services staff told her that there was no evacuation chair in the building. Taylor requested that they obtain one so that she would be able to evacuate in the case of an emergency. The staff member told her she would escalate the request to her manager.

123.   Over the next three months, Taylor followed up with Housing Services via email at least seven times and exchanged emails with three different staff members to inquire about whether her apartment building had obtained an evacuation chair. Each time, Taylor was told that they either had no update for her or had not obtained one yet.

124.   On January 19, 2024, Fabiola Quezada, the Area Manager for UCLA Apartments North, emailed Taylor to tell her that there was no evacuation chair at the Weyburn Terrace apartments. She noted that "we are actively collaborating with the Assistant Director of Housing Safety to acquire an evacuation chair for the building."

125.   On April 10, 2024, Taylor was informed by a staff member from Housing Services that a manager for the University Apartments had told her "As of now, I believe there are no evac chairs in UA. We have been working on this, and our plan is ultimately to add these to every building. If the resident is concerned about this in the meantime, in checking with RL/FD, UCFD shared ***though it is not typically their practice to use evac chairs***, they do carry this equipment on the trucks and maintain and know how to use them should the need arise." (emphasis added).

126.   As of the date of filing this Complaint, there are still no emergency evacuation chairs in Taylor's building, and Taylor's efforts to work with UCLA to develop an individualized (or any) plan for her evacuation during emergencies have been unsuccessful—UCLA has repeatedly failed to coordinate with her to create such a plan. Additionally, UCLA Housing Services has never provided Taylor with any information about emergency management—including evacuation—for people living in UCLA student housing.

127.   Taylor estimates that the fire alarm has gone off in her apartment building about five times since she moved in. She has luckily been able to evacuate because her apartment is on the ground floor, but she is only able to do so because she has succeeded in forcing open the heavy fire doors with her legs (albeit with significant difficulty). Still, if there were to be an emergency where debris blocked the path of travel out of the building Taylor may need additional assistance. And currently, the availability of such assistance is not guaranteed, in fact, it has not even been considered. Taylor has never received assistance from Campus Housing staff during a fire drill, and for over a year, UCLA has failed to collaborate with Taylor to create an individualized plan for her to safely evacuate her apartment in an emergency.

**UCLA Has Failed to Provide Disability Specific Emergency Evacuation Protocols and Evacuation Chairs: CHS Building**

128.   On January 8, 2024, Taylor emailed a Graduate Student Affairs Officer

("SAO") for the Fielding School of Public Health, asking how she could get access to the UCLA campus evacuation protocol, including protocol for students with physical disabilities. She also asked if there were any evacuation chairs in the CHS building.

129.   The SAO replied on January 17, 2024 saying that she had escalated the issue to school leadership. She also provided Taylor with two maps showing the exits in the CHS building, as well as the designated assembly areas on campus for emergency evacuations. She also provided her with a flyer on what to do during an earthquake, but the flyer had no information about evacuation protocol or information specific to people with disabilities other than to say, "If you use a wheelchair, lock your wheels and cover your head."

130.   On January 11, 2024, Taylor asked Ms. Kovnator via email whether any evacuation chairs were available in the CHS building and Ms. Kovnator replied that she wasn't sure.

131.   On January 16, 2024, Taylor followed up with Ms. Kovnator about the evacuation chairs, and Ms. Kovnator replied she had forwarded the question to the Facilities Department. Over the next two months, Taylor followed up via email with Ms. Kovnator about the evacuation chairs at least five times and never received an update about the evacuation chairs.

132.   On January 26, 2024, the SAO sent Taylor a document detailing the emergency assembly area for the CHS building. She also told Taylor she would update her about the evacuation chairs soon. Taylor never received this update.

133.   On February 16 and February 22, 2024, Taylor emailed Lisa Martin, the Director of the Office of Emergency Management, inquiring about the accessibility of campus evacuation protocols. Taylor noted that she had recently come across a "UCLA Emergency Operations Desk Reference" guide on campus and asked whether one was located in every room on campus, when it had last been updated, and whether the "Evacuating People With Disabilities" section of the guide could be expanded. She also asked how many evacuation chairs are in each building on campus. She noted that she

would like to personally contribute to efforts to increase the accessibility of emergency response guidelines. Ms. Martin, the Director of the office best situated to provide her with emergency preparedness and evacuation information, never responded to either email.

134.    On March 7, 2024, Taylor reached out to a Professor at the Geffen School of Medicine to discuss the resources available to students with disabilities at UCLA. During a meeting with the Professor, Taylor expressed concerns about the inaccessibility of UCLA's emergency evacuation plans and lack of evacuation chairs. The Professor gave her the names of other people to reach out to but did not know much about UCLA's emergency preparedness procedures.

135.    On March 14, 2024, Taylor reached out to a CAE staff member about the resources available to students with disabilities at UCLA. During a meeting with this CAE staff member, she expressed concerns about the inaccessibility of UCLA's emergency evacuation plans and lack of evacuation chairs. The CAE staff member provided Taylor with a map of UCLA's allegedly accessible infrastructure, but did not follow up with Taylor about emergency preparedness.

136.    On April 11, 2024, Taylor met with an Operations and Research Coordinator at the Semel Healthy Campus Initiative Center at UCLA. Taylor informed the Operations and Research Coordinator that she had learned of multiple buildings that did not have evacuation chairs. That same day, the Operations and Research Coordinator emailed a colleague asking if any wheelchairs or emergency evacuation chairs could be diverted from the UCLA hospital. As illustrated by Jake's experiences, CAE does not have accurate knowledge of information about the true accessibility of physical features on campus.

137.    The Operations and Research Coordinator informed Taylor via email on April 23, 2024 that their boss was planning to bring up the lack of emergency evacuation chairs at a meeting with the school administration. Taylor never heard back about the outcome of this meeting.

138.    On June 20, 2024, the Operations and Research Coordinator's colleague
connected them and Taylor with the Director of Supply Chain Operations and Logistics
at UCLA Health General Services Department. The Director told Taylor that his
department receives "end of life" wheelchairs which they look to repurpose, and asked
how many were needed. At this point, the Operations and Research Coordinator told the
Director of Supply Chain Operations and Taylor that "the campus is moving towards a
different model for evacuation." This was the last Taylor heard about the evacuation
plans. Upon information and belief, no wheelchairs have been diverted from the
hospital for emergency use elsewhere on campus, despite the Supply Chain Director's
willingness to make this happen.

139.    Taylor has observed that UCLA does very little to disseminate information
about emergency preparedness and evacuation protocols on campus to nondisabled
students and disabled students alike—she has had to seek out this information herself.

140.    Taylor has also observed a general lack of knowledge among UCLA staff
about emergency preparedness and evacuation protocols on campus for students with
disabilities. Remarkably, the majority of the UCLA staff Taylor has spoken to regarding
UCLA's emergency management plans and services were unaware of what an
evacuation chair is.

141.    As of the date of filing this Complaint, there are still no emergency
evacuation chairs in the CHS building, and Taylor's efforts to work with UCLA to
develop an individualized (or any) plan for her evacuation during emergencies have
been unsuccessful. UCLA has repeatedly failed to work with Taylor to create such a
plan, despite her repeated attempts. Additionally, UCLA has never provided Taylor
with any information about its campus emergency evacuation or preparedness plans.
The message sent to Taylor by CAE, OEM and other UCLA staff is that in the event of
an emergency she is on her own.

142.    During the time she has been at UCLA, at least one emergency fire alarm
has occurred while Taylor was on campus, in Murphy Hall. Taylor was only able to

evacuate the building because she had just gotten out of the elevator onto the ground floor when the alarm went off. If Taylor had been on an upper floor in Murphy Hall, or in any of the classrooms in the CHS building where her classes were located, the elevators would have been inoperable, and she would have been unable to evacuate. For over a year, UCLA has failed to collaborate with Taylor to create an individualized plan for her to safely evacuate her from buildings on campus in an emergency. As a result, she remains unprepared and at risk of injury and death in the event of an emergency.

### Taylor's Experience as a Teaching Assistant Confirms Lack of Training of UCLA Personnel on Assisting Disabled Students During Emergencies.

143.   Taylor worked as a teaching assistant ("TA") for "HLT POL 286: American Political Institutions and Health Policy" in Fall Quarter 2024. Before she began her work as a TA, Taylor was required to complete a course called "PUB HLT 495: Preparation for Teaching Public Health." She took this course during Spring Quarter 2024. As part of the course, she was required to complete an online training called "Professional Standards and Ethics Training for TAs." Module 1.6 of this online training course was called "Campuswide Emergencies," and included information about emergency preparedness and emergency evacuations, including what TAs should do during an active shooter situation, an earthquake, or a fire. The course provided sparse and inadequate information on assisting people with disabilities in the event of an emergency. TAs were directed to familiarize themselves with their building's evacuation plan on their own. The course included no information on how to assist people with disabilities under the topics of "Active Shooter," Earthquake," or "Fire Safety." The only disability-specific information provided was under "Evacuation," and conveyed to TAs that it is the responsibility of students with disabilities to develop their own emergency plan and communicate their needs to the TA in the event of an emergency.

## FIRST CAUSE OF ACTION:
### VIOLATION OF TITLE II OF THE ADA
**Denial of Access - Emergency Management Services, Programs, and Activities**
**[42 U.S.C. §§ 12131, *et seq.*]**
*(Against All Defendants)*

144.   Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

145.   Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

146.   Plaintiffs are, and at all times relevant herein were, qualified individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131(2).

147.   Defendant Regents is a corporation endowed by the California Constitution a public entity within the meaning of the ADA. 42 U.S.C. § 12131(1).

148.   Defendants Michael V. Drake, M.D. and Julio Frenk are sued in their official capacities as the President of the University of California and Chancellor of UCLA respectively. Both the University of California and UCLA are public entities within the meaning of the ADA. 42 U.S.C. § 12131(1).

149.   Title II of the ADA applies to UCLA's emergency management services, programs, and activities.

150.   Plaintiffs, are, and at all times relevant herein were, "qualified" individuals with disabilities within the meaning of Title II of the ADA. 42 U.S.C. § 12131(2). As students at UCLA, Plaintiffs meets the essential eligibility requirements to access, use, participate in and benefit from UCLA's emergency management services, programs, and activities.

151.   Defendants' acts and omissions as alleged above, and described with more detail below, have excluded and/or denied Plaintiffs the benefit and use of UCLA's

emergency management services, programs, and activities, in violation of Title II and its implementing regulations. The Defendants' discriminatory conduct includes, *inter alia*:

    a. Failing and refusing to operate UCLA's emergency management services, programs, and activities so that they are "readily accessible to and usable by individuals with disabilities" (28 C.F.R. § 35.150(a));

    b. Denying Plaintiffs the opportunity to participate in or benefit from the aids, benefits, or services offered by and through UCLA's emergency management services, programs, and activities, on the basis of their disabilities (28 C.F.R. § 35.130(b)(1)(i));

    c. Affording Plaintiffs an opportunity to participate in or benefit from UCLA's emergency management services, programs, and activities that is not equal to that afforded their non-disabled peers (28 C.F.R. § 35.130(b)(1)(ii));

    d. Otherwise limiting Plaintiffs in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aids, benefits, or services offered by Defendants by and through UCLA's emergency management services, programs, and activities (28 C.F.R. § 35.130(b)(1)(vii));

    e. Utilizing methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of their disability (28 C.F.R. § 35.130(b)(3)(i)); and

    f. Failing and refusing to make reasonable modifications in policies, practices, or procedures where necessary to avoid discrimination against Plaintiffs on the basis of their disability (28 C.F.R. § 35.130(b)(7)).

152. Plaintiffs' experiences at UCLA and documents produced by UCLA in response to an August 27, 2024 California Public Records Act request illustrate the above-alleged lack of access and are indicative of a systemic failure to comply with the

ADA's mandate that emergency management services, programs, and activities be accessible to people with disabilities.

### Requirements for Emergency Management Services, Programs, and Activities

153.   The U.S. Department of Justice ("DOJ") advises that there are at least four essential components of emergency planning that must be addressed to make emergency preparedness programs accessible to people with disabilities.[1]  They are:

   a. *Preparation* – advance planning for emergencies and disasters;

   b. *Testing of Preparedness* – staging emergency simulations and other approaches to testing the effectiveness of emergency preparedness;

   c. *Notification* – alerting the public to emergencies and disasters and to available programs, services, and activities; and

   d. *Community Evacuation* – ensuring that the public can evacuate safely.[2]

154.   The ADA requires that all four of these components be meaningfully accessible to people with disabilities. ADA regulations since 1990 have emphasized that, "[b]ecause people with disabilities may visit, be employed or be a resident in any building, emergency management plans with specific provisions to ensure their safe evacuation also play an essential role in fire safety and life safety." 1991 Standards § A4.3.10 Egress.

155.   The DOJ's guidance also states that "An emergency management plan is the all-important first step in ensuring an effective response to emergencies and disasters. Public officials, specialists from organizations such as the American Red Cross, and community members should work together to develop a comprehensive plan

---

[1] *See* "ADA Best Practices Tool Kit for State and Local Governments: Emergency Management Under Title II of the ADA" (Oct. 26, 2009) available at https://www.ada.gov/pcatoolkit/chap7emergencymgmt.htm.

[2] *See id*.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

to prepare for emergencies."[3] Further, the DOJ advises that public entities should seek and use input from people with disabilities and organizations with expertise on disability issues to ensure that "emergency planning and preparedness meet the access needs of people with disabilities in your community with respect to all phases of emergency management."[4]

156.    The National Fire Protection Association in conjunction with the United States Access Board advise that emergency planning teams should include people with disabilities, should gather information directly from affected people with disabilities about their needs during an emergency, and should provide ways for people with disabilities to self-identify and communicate their needs.[5] The created plan should also be responsive to the communicated needs of people with disabilities.[6]

### Defendants' Failure to Make UCLA's Emergency Management Services, Programs, and Activities Accessible to People with Disabilities

157.    Plaintiffs' personal experiences and public records provided by UCLA illustrate that Defendants have failed to address the four essential components of emergency planning for people with disabilities and have not taken the steps required to ensure that their emergency management services, programs, and activities meet the access needs of people with disabilities.

### *Preparation: UCLA Fails to Include and Account for People with Disabilities in Emergency Management Plans and Policies*

158.    Advanced preparation for emergencies and disasters at UCLA for people with disabilities is virtually non-existent. Upon information and belief, UCLA has failed to prepare for emergencies in a way that accounts for the needs of people with

---

[3] *Id.*

[4] *Id.*

[5] *See* National Fire Protection Association, *Emergency Evacuation Planning Guide for People with Disabilities* 6 (Nov. 2022) available at https://www.nfpa.org/downloadable-resources/guides/evacuation-guide-pdf.

[6] *See id.*

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

disabilities by (1) failing to create and implement a comprehensive and cohesive plan that includes and accounts for the needs of people with disabilities; (2) failing to train faculty and staff to assist in evacuating people with disabilities during an emergency, and; (3) failing to prepare people with disabilities for an emergency. Each of these failures is discussed in detail below.

**Failure to create and implement a comprehensive plan that includes and accounts for the needs of people with disabilities**

159.    Records produced by Defendants indicate that UCLA lacks a comprehensive, cohesive plan to keep people with disabilities safe during an emergency on campus or in UCLA student housing.

160.    A document produced by UCLA titled "University Evacuation Annex: Westwood Campus" from June 2023 ("2023 Annex") appears to be the most current campus emergency preparedness and evacuation plan for UCLA. The 2023 Annex provides a limited, high-level overview of four isolated disability related considerations: emergency communications, evacuations and areas of safe refuge, transportation accommodations, and service animals, but falls short of creating a comprehensive emergency preparedness and evacuation plan for people with disabilities. It is insufficient to meet the needs of disabled people.

161.    The 'Emergency Communication" subsection provides no information about how to contact interpreters or communicate with people with communication disabilities beyond alerting them to an emergency situation's existence.

162.    The "Evacuation and Areas of Safe Refuge" subsection notes that people who cannot evacuate should shelter-in-place in a building's area of safe refuge (typically a stairwell) or in a safe area away from danger. Concerningly, the 2023 Annex instructs that people with disabilities can be left in stairwells or other locations and fails to create a process by which faculty and staff can systematically identify people who may need help in the building in order to communicate their location to emergency responders. It does not identify ways that people with disabilities can

communicate their locations either. The 2023 Annex also provides no guidance on when to initiate an evacuation for a wheelchair user as opposed to leaving them behind during an emergency.

163.    The "Transportation Accommodations" subsection provides no guidance on how to ensure that people with disabilities are connected with adequate accessible transportation.

164.    The "Service Animals" subsection provides no information on how to provide evacuation assistance to service animal handlers other than to explain that service animals should be evacuated with their owner.

165.    The 2023 Annex also fails to consider what may be necessary to safely evacuate a person with multiple disabilities—like, for example, what a power wheelchair user who uses assistive technology to communicate may need to evacuate.

166.    Additionally, the 2023 Annex relies heavily on faculty and staff for ensuring people with disabilities can evacuate in an emergency, yet the 2023 Annex fails to give faculty and staff the specific tools and information necessary to effectively assist people with disabilities during an emergency.

167.    Another document provided by UCLA, titled "Emergency Preparedness and Evacuation Checklist" ("Checklist"), was created by a University of California Office of the President ("UCOP") Capital Programs work group formed in November 2023 in response student complaints about inaccessible emergency drills on UC Campuses. The work group was formed to "evaluate campus evacuation plans, with a focus on accessibility, and to create systemwide guidance on emergency procedures."[7] The Checklist lays out the steps a campus must take in order to create and operate a comprehensive emergency preparedness plan that considers the needs of people with disabilities. Each campus is required to designate a campus representative that reports back to the workgroup on the campus's progress quarterly.

---

[7] *See e.g.*, Nov. 15, 2023 Board of Regents minutes at 8.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

168.   The Checklist includes three steps, each with multiple sub-steps: (1) designated campus representative; (2) development of an individualized emergency evacuation plan (IEEP) and; (3) emergency evacuation chairs (where provided). In response to a public records request, UCOP produced a copy of the Checklist that was marked up by UCLA and submitted to UCOP on January 1, 2024 ("UCLA Checklist"). As of that date, UCLA had checked off only two of the 25 total tasks. Upon information and belief, UCLA has failed to complete each step of the Checklist.

169.   The Checklist provides a detailed, step-by-step instruction manual on how to make emergency planning and evacuation operations accessible to people with disabilities, yet the only comprehensive emergency preparedness plan UCLA has produced is void of nearly all of the information required by the Checklist. The 2023 Annex does not include *any* information about coordination of IEEPs, testing of the effectiveness of IEEPs, which departments or individuals will be responsible for handling IEEP requests, which individuals will be assigned to help evacuate students, effective communication with evacuees, or where evacuation chairs are located, how to operate them, and who is responsible for maintaining them. Taylor and Jake's personal experiences further confirm that there is no IEEP process currently in place, and there is no coordinated effort to ensure evacuation chairs are available across campus. To the extent that the 2023 Annex must be updated to reflect the requirements of the Checklist, UCLA has had nearly a year and six months to do so, but no updated Annex or supplement to the Annex has been released.

170.   Documents produced by UCLA and Plaintiffs' experiences indicate that UCLA has no comprehensive plan currently in place for ensuring that people with disabilities will be kept safe during an emergency despite having access to a step-by-step guide on how to make emergency preparedness and evacuations accessible to people with disabilities. This systemic failure puts Plaintiffs and others at risk of harm and even death.

**Failure to prepare and train faculty and staff to assist in evacuating people with disabilities during an emergency**

171.   Documents produced by UCLA and Plaintiffs' personal experiences indicate that UCLA fails to prepare to meet the needs of people with disabilities in an emergency by failing to train faculty and staff adequately to assist people with disabilities during an emergency.

172.   The 2023 Annex, which appears to be UCLA's comprehensive emergency evacuation plan, relies heavily on the assistance of faculty and staff to ensure that people with disabilities are able to evacuate. At the same time, the 2023 Annex provides very little information about how to ensure a safe evacuation for people with disabilities from the start to finish of an emergency situation.

173.   The Checklist also includes several examples of how faculty and staff should be employed to help people with disabilities in an emergency and suggests that these staff are trained in the operation of evacuation chairs, communicating with evacuees in conformance with the ADA's effective communication requirements, and disability etiquette.

174.   Upon information and belief, UCLA does not adequately train faculty and staff in any of these areas.

175.   A document provided by UCLA in response to a public records request appears to be a schedule of planned emergency preparedness trainings and exercises for different departments at UCLA. Only one of the seventeen planned emergency preparedness trainings is listed as "complete," and the other sixteen have missed their "target quarter" for release by over a year. None of the planned training titles reference disability. Of the seventeen planned emergency exercises or drills, only one is labeled as "complete." The incomplete exercises and drills have all missed their target quarters for release by over a year. None of the planned exercises and drills reference disability.

176.   This document indicates that emergency preparedness trainings and drills are lacking at UCLA generally, and trainings and drills specific to the needs of people

with disabilities appear to be nonexistent. Plaintiffs' experiences further reinforce this fact.

177.    Taylor also experienced firsthand the inadequacy of emergency preparedness and evacuation training for staff on campus. Before Taylor began work as a TA in Fall 2024, she was required to complete an online training in Spring 2023 called "Professional Standards and Ethics Training for TAs." The "Campuswide Emergencies" Module of the training instructs TAs that they will be responsible for helping students with disabilities evacuate during an emergency but fails to provide information to prepare TAs to effectively assist people with disabilities in an emergency.

178.    UCLA's failure to have a comprehensive plan in place that accounts for the needs of people with disabilities combined with its failure to train faculty and staff to assist people with disabilities during an emergency is a violation of the ADA and leaves Plaintiffs at great risk of injury and even death during an emergency at UCLA.

### Failure to prepare people with disabilities for an emergency evacuation

179.    Plaintiffs' experiences and documents produced by UCLA confirm that Defendants also fail to prepare for emergencies in a way that accounts for the needs of people with disabilities by systematically failing to prepare people with disabilities themselves.

180.    UCLA produced a document titled "Self-Certification of Access and Functional Needs Form" that UCLA employees can fill out to identify their needs during an emergency. But the form is discriminatory in that it places the onus on the staff member with a disability to create their own evacuation plan and communicate it to the relevant people, while nondisabled staff members benefit from existing emergency preparedness plans without having to develop their own plans.

181.    Still, the form at least gives employees a structure through which to create

an evacuation plan for themselves. Plaintiffs' experiences and documents produced by UCLA indicate that a similar form is not made available to UCLA *students* who may need evacuation assistance—neither Plaintiff was provided with such a form despite advocating for the creation of their own evacuation plans.

182.   When students are unsuccessful in proactively locating the information they need to create an effective emergency plan for themselves through asking UCLA faculty and staff, they cannot turn to online information to supplement their efforts.

183.   A review of UCLA emergency planning documents available online to students, faculty, and visitors yielded no current documents that discuss campuswide emergency planning and preparedness for people with disabilities. The only available online references to emergency planning or preparedness for people with disabilities include an outdated "Campus Departmental Emergency Response Plan Template" revised in 2009 which fails to create a comprehensive emergency plan inclusive of people with disabilities for the same reasons the 2023 Annex fails, and the "Workplace Preparedness" page on the UCLA Luskin School of Public Affairs website. Neither of the Plaintiffs is enrolled in the Luskin School.

184.   The Luskin School website includes a link to a page titled, "Access/Functional Needs" under "Workplace Preparedness." The page instructs people with disabilities to fill out a "Self-Certification of Access and Functional Needs" form, but the hyperlink to the form is broken.[8] Further, the page notes that people with disabilities should recruit buddies to ensure they can evacuate and implores faculty to assist with evacuating people with disabilities.[9] The Luskin School emergency plan falls short for the same reasons as the 2023 Annex (*i.e.*, does not inform individuals with disabilities *how to prepare themselves* for an emergency and assumes a person with a disability's only emergency planning option is to be helped by someone else;

---

[8] UCLA Luskin School of Public Affairs, *Access/Functional Needs*, available at https://luskin.ucla.edu/administration/emergency-safety/workplace-preparedness/accessfunctional-needs (last visited March 27, 2025).

[9] *See id.*

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

does not adequately inform staff how to assist people with disabilities).

185.    Emergency planning at UCLA is deficient and discriminatory on the face of available emergency planning materials. UCLA seemingly has no comprehensive emergency plan for people with disabilities that are accessible to students online or otherwise. Plaintiffs have asked Defendants' representatives for information about UCLA's emergency management plans, as well as for plans that consider their disabilities—including the provision of emergency evacuation chairs—but they have been ignored.

**Testing of Preparedness: UCLA Fails to Include People with Disabilities in Emergency Management Drills and Testing.**

186.    The DOJ advises that testing of preparedness includes "staging emergency simulations and other approaches to testing the effectiveness of emergency preparedness" and that "[o]ne good way to test your emergency management plan is to enlist people with disabilities to role-play during emergency simulations."[10]

187.    Defendants fail to meaningfully test emergency preparedness for people with disabilities on the UCLA campus. Specifics of how disabled people should be included in emergency simulations and drills are not included in policies. UCLA has failed to provide any training materials for UCLA staff on these topics. Given that each disabled person must obtain their own emergency preparedness information and must develop aspects of their own emergency plans, there appear to be no opportunities or processes for practicing those plans during broader emergency simulations.

188.    As mentioned above, a document produced by UCLA in response to a public records act request that appears to be a schedule of planned emergency preparedness exercises and drills shows that UCLA fails to adequately test emergency preparedness generally, let alone for people with disabilities.

---

[10] Department of Justice, *"*ADA Best Practices Tool Kit for State and Local Governments: Emergency Management Under Title II of the ADA" (Oct. 26, 2009) available at https://www.ada.gov/pcatoolkit/chap7emergencymgmt.htm.

189.    In addition to never being given the opportunity to create IEEPs in collaboration with UCLA, Plaintiffs have never been offered the opportunity to practice individualized emergency preparedness plans during an emergency drill.

190.    Though UCLA has a small number of evacuation chairs in UCLA Housing buildings, it is unclear if UCLA has any evacuation chairs on campus (or if they do, where those chairs are located), intercom systems, or other tools for taking personal protective measures at areas of refuge for Plaintiffs and other students with mobility disabilities to practice emergency evacuation simulations and testing. Additionally, there is no evidence that UCLA meaningfully practices the use of emergency evacuation chairs with disabled persons or the staff apparently responsible for helping people with disabilities evacuate.

191.    Despite repeated requests, Plaintiffs were denied information, the opportunity to create IEEPs, and/or the ability to practice individualized evacuation plans during drills. While scheduled drills appear to exist for non-disabled persons, there is no indication from the documents produced by UCLA or any documents available online that UCLA meaningfully coordinates testing with people with disabilities or includes disabled people in the design, control, or evaluation of their simulations in violation of the ADA. Without an adequate mechanism to create IEEPs and test emergency preparedness operations for people with disabilities, people with disabilities are at risk of injury and death during a real emergency.

### *Notification: UCLA Fails to Notify People with Disabilities of Emergency Planning Resources and Programs That Are Accessible.*

192.    The DOJ advises that emergency notification includes "alerting the public to emergencies and disasters and to available programs, services, and activities."[11] The DOJ recommends that the best practice for emergency planning is for public entities to develop confidential lists of people with disabilities to provide them with access to

---

[11] *Id.*

emergency preparedness programs and evacuation assistance. However, UCLA's OEM website, general website, and student handbooks make no reference to any such list. This lack of notification to disabled persons is particularly concerning when combined with Defendants placing the responsibility for emergency preparedness planning on disabled persons themselves.

193.   Beyond this, UCLA provides no information to people with disabilities about how to voluntarily create an IEEP in collaboration with UCLA, how to sign up for disaster preparedness lists that would aid emergency personnel to find and assist them, or how to participate in emergency preparedness drills. No documents on any campus website provide information to persons with disabilities about how they may participate in emergency simulations and drills. No such resources were provided to Plaintiffs, even when they specifically inquired about emergency planning for people with disabilities prior to arriving on campus and while on campus. As a result, UCLA has completely failed to notify disabled people about any emergency preparedness resources that adequately address the needs of people with disabilities. UCLA has left disabled people to fend for themselves in an emergency.

### Community Evacuation: UCLA Fails to Provide Safe Evacuation Options for People with Disabilities.

194.   The DOJ states that entities "need to establish procedures to ensure that people with disabilities can evacuate the area of an emergency in a variety of conditions, with assistance when it is needed."[12] As discussed above, UCLA has no process for ensuring people with disabilities will be assisted in evacuating during an emergency. Safe means of egress is also essential for meaningful emergency management programs for people with disabilities. Without a safe means of egress, people with mobility disabilities may be unable to evacuate.

195.   To ensure a safe means of egress, UCLA must either provide a rehearsable plan for evacuating disabled persons from an accessible area of rescue with two-way

---

[12] *Id.*

communication for persons with disabilities to reach rescue workers, or a similar plan that includes an evacuation chair that, with assistance of nondisabled persons, a person with a disability can use to exit safely. A safe means of egress is essential and indispensable part of accessible emergency planning and management. The best practice is to have both. For example, in the event of a power outage or structural damage, the communication system may not be available. Therefore, without an alternative means of egress, a disabled person is in danger, alone, and stranded. An evacuation chair in every UCLA building with floors above ground level is necessary to ensure meaningful participation in emergency evacuation programs.

196.    Plaintiffs' experiences with UCLA representatives and documents produced by UCLA indicate that UCLA may not have two-way communication systems in all its buildings to ensure people with disabilities can communicate with first responders.

197.    Additionally, documents produced by UCLA and Plaintiffs' interactions with Defendants' representatives confirm that UCLA does not have emergency evacuation chairs in all multi-level buildings and that UCLA may not have a comprehensive understanding of which buildings have emergency evacuation chairs. UCLA produced a document titled "H&H Evacuation Chair Inventory" ("Evacuation Chair List") dated September 27, 2024. The document is an inventory list keeping track of which UCLA housing buildings have an evacuation chair and where the chairs are located in each building. The Evacuation Chair List indicates that there are evacuation chairs in only 16 out of 62 total UCLA housing buildings (only 25%). As of September 27, 2024, Taylor's apartment building still did not have an evacuation chair despite her repeated requests. No such list has been produced for UCLA's non-housing facilities, but Plaintiffs' experiences attempting to locate evacuation chairs for their use on campus indicate that UCLA does not have an adequate stock of evacuation chairs in their buildings to ensure that people with mobility disabilities are able to safely evacuate in an emergency.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

198.  UCLA fails to provide safe evacuation options to people with disabilities, meaning people with mobility disabilities are literally left to fend for themselves on UCLA's campus in the event of an emergency that requires evacuation or some other emergency response.

199.  The barriers alleged herein are listed without prejudice to Plaintiffs citing additional barriers to access by an amended complaint after a complete inspection and evaluation by Plaintiffs' access consultant(s)/expert(s).

200.  The barriers alleged herein render the services, programs, and activities of UCLA inaccessible to Plaintiffs. Plaintiffs will continue to encounter these barriers as they finish their respective degrees. Plaintiffs will also encounter these barriers in the future when they return to UCLA to enjoy the services, programs, and activities available to them as alumni and members of the to the general public, and if Jake returns to UCLA as a graduate student.

201.  Defendants' obligations under Title II of the ADA are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

202.  Defendants have been provided actual notice of their obligations under Title II of the ADA and Defendants' duty to remediate their failures. Despite this knowledge, Defendants have failed and refused to take the steps necessary to address Plaintiffs' concerns or otherwise ensure services, programs, and activities comply with the requirements of the ADA. Defendants' failures in this regard constitute deliberate indifference.

203.  Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiffs pray for judgment as set forth below.

//
//
//

**SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE II OF THE ADA**
**Denial of Program Access**
**[42 U.S.C. §§ 12131, *et seq*.]**
*(Against All Defendants)*

204.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

205.    In addition to their emergency planning and preparedness failures at UCLA, Defendants have failed in numerous other ways to meet their obligations under Title II of the ADA to provide people with mobility disabilities including Plaintiffs with meaningful access to UCLA's programs, services, and activities. Specifically, Defendants have: (1) failed to ensure the accessibility and usability of UCLA's existing facilities (28 C.F.R. § 35.150(a)); (2) failed to conduct an adequate self-evaluation or develop an adequate transition plan (28 C.F.R. § 35.105; 28 C.F.R. § 35.150(d)); (3) failed to ensure that "each facility" constructed or altered after June 26, 1992 is "readily accessible to and usable by individuals with disabilities" (28 C.F.R. § 35.151(a)(1), (b)(1)); (4) failed to maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by disabled people (28 C.F.R. § 35.133(a)); (5) failed to ensure that disabled people, can obtain information as to the existence and location of accessible services, activities, and facilities (28 C.F.R. § 35.163(a)); and (6) failed to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability (28 C.F.R. § 35.130(b)(7)(i)).

**Failure to Ensure the Accessibility and Usability of UCLA's Facilities**

206.    To state a claim under Title II, a plaintiff must show he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities. *See generally* 42 U.S.C. §§ 12131-12134. An individual is excluded from participation in or denied the benefits of a public program if "a public entity's facilities

are inaccessible to or unusable by individuals with disabilities'" 28 C.F.R. § 35.149.

207.   Where an individual is excluded from participation in or denied the benefits of a public entity's services, programs, or activities due to alleged inaccessibility of a public agency's facilities, the DOJ's implementing regulations establish two different standards. One for existing facilities and one for new construction and alterations.

208.   In the case of facilities that have not been constructed or altered since January 26, 1992, the standards for "existing facilities" apply. *See* 28 C.F.R. § 35.150 (requiring that the public entity operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.").

209.   The standards for new construction and alterations differ significantly, requiring that "*each facility or part of a facility* constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151(a)(1) (emphasis added). With regard to alterations in particular, the DOJ regulations provide that: "*Each facility* or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, *to the maximum extent feasible*, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992." 28 C.F.R. § 35.151(b)(1) (emphasis added).

210.   Defendants have failed to comply with the standards for existing standards and the standards for new construction and alterations.

### *Existing Facilities*

211.   UCLA, which is over a century old, has several buildings and areas on campus that were designed and built before the enactment of the ADA, and thus, are not

accessible to people with mobility disabilities. Defendants are nonetheless mandated to take action to ensure that the inaccessibility of these "existing facilities" does not exclude disabled people from participating in, or deny them the benefits of, the services, programs, or activities provided at UCLA, and that each of UCLA's services, programs, and activities are readily accessible to and useable by disabled people. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.150(a). UCLA is not required to make structural changes in existing facilities where other methods are effective in achieving compliance. 28 C.F.R. § 35.150(b)(1).

212.   As part of the obligation to provide program access, all public entities must complete a self-evaluation, and those with 50 or more employees must also have a transition plan that addresses structural changes that are necessary for achieving program accessibility. 28 C.F.R. § 35.105; 28 C.F.R. § 35.150(d).

213.   On information and belief, Defendants have not conducted a self-evaluation or developed a transition plan addressing the structural changes that are necessary for achieving program access at UCLA, despite the requirement to do so.

214.   As the experiences of Plaintiffs—detailed above—illustrate, numerous structural barriers have been permitted to persist at UCLA. These barriers, summarized below, have resulted in an ongoing denial of program access to Plaintiffs. Defendants have not employed any other methods to effectively achieve compliance with Title II's program access obligations in any of these areas, triggering this lawsuit.

215.   <u>Inaccessible buildings across campus deny program access to UCLA's academic, recreational, and housing programs</u>. Doors to many buildings, classrooms, and restrooms throughout campus lack automatic door openers or have automatic door openers that are out of service because of a failure to maintain accessibility features. *See* 28 C.F.R. § 35.133 (a). Other doors require excessive pressure to open and/or close faster than the maximum allowed closing speed (*i.e.*, no less than three seconds). *See* 1991 ADA Standards for Accessible Design ("1991 ADAAG") 4.13.11(2)(b); 1991 ADAAG at 4.13.10.

216.    <u>The failure to provide accessible furniture in classrooms denies program access to UCLA's academic programs</u>. Defendants have failed to ensure that UCLA has the required percentage of accessible furniture in its classrooms, which must meet certain access specifications and be located on an accessible route. *See* 1991 ADAAG at 4.1.3(19) and 4.1.3(19)(a).

217.    <u>The failure to provide and designate accessible routes connecting buildings on campus denies access to UCLA's public rights of way, common areas, and system of academic and non-academic buildings</u>. Many walkways and other pedestrian paths of travel (including in high-traffic areas) on UCLA's campus are inaccessible, do not comply with applicable access-related building standards, and in some cases create dangerous conditions for people who use mobility aids and devices. Additionally, many paths of travel on the UCLA campus are in disrepair and have not been maintained in an accessible condition, creating dangerous conditions for people who use mobility aids and devices. These include:

a. Curb ramps that have:

    i.    running slopes that are too steep (more than 8.33%), *see* 1991 ADAAG at 4.7.2;

    ii.    cross slopes on the ramp itself or on the required landing space that exceed the maximum of 2%, *see* 1991 ADAAG at 4.3.7 and 4.8.6;

    iii.    changes in elevation (lips) at the base of the ramp where it transitions to the gutter or road that are greater than 1⁄2 inch, *see* 1991 ADAAG at 4.7.2;

    iv.    counter slopes in the adjoining gutter or road surface that exceed 5%, *see* 1991 ADAAG at 4.3.7 and 4.8.6;

    v.    slopes on the sides of the ramps (flares) that are greater than the maximum of 10%, *see* 1991 ADAAG at 4.7.5 and Fig. 12a; and

    vi.    ramps that are too narrow, *see* 1991 ADAAG at 4.7.3.

b. Paths of travel all over campus that are plagued with vertical changes in

elevation, holes in cobblestones/tiles/pavement, and large gaps around utility covers. *See* 1991 ADAAG 4.3.8.

   c.  Courtyards and other areas for non-directed pedestrian movement that have excessive slopes. *See* 1991 ADAAG at 4.3.7 & 4.3.3.

   d.  Walks leading to entry doors of buildings on campus that are too steep (more than 5.0%). *See* 1991 ADAAG 4.3.7.

   e.  Drainage grates in walkways around campus that are bent. *See* 1991 ADAAG at 4.3.8; 28 C.F.R. § 35.133(a). Many have spaces larger than 1/2 inch, and drain covers with elongated openings are situated so the openings run parallel to the primary direction of traffic. *See* 1991 ADAAG at 4.5.4, Fig. 8(g), and Fig. 8(h). These conditions are hazards to wheelchair users because they are located within main paths of travel and may cause a wheelchair user to get stuck and be thrown from their chair.

218.   With regard to the widespread barriers on paths of travel at UCLA, Defendants are, and have been, on notice, not only from members of the student body, but by their own retained architect firm. Between December 2022 and May 2024, UCLA hired Sally Swanson Architects, Inc. to conduct a campus-wide "access compliance survey" to evaluate parking and external paths of travel connecting building entrances on campus. SSA's Access Compliance Survey Report ("SSA Report") confirms the multiple physical barriers Plaintiffs encountered and continue to encounter on campus, including but not limited to the following:

   a.  Drain grates with "openings greater than 1/2" along the line of traffic flow;"

   b.  Walks leading to entrances for the Mathematical Sciences Building are too steep and exceed maximum allowed slopes;

   c.  Buildings on campus lack necessary and required signage to direct users to an accessible entrance or to a location at which they can obtain information about accessible facilities;

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

d. On the route leading to the designated accessible entry door at Franz Hall, there is an abrupt change of level that exceeds 1/2" in the accessible route;

e. Pavement dislocation creates an abrupt change in level exceeding 1/2" in the accessible route near the Schoenberg Music Building;

f. The slope and cross slope of the ramp that leads to the entrance of the Schoenberg Music Building exceed applicable access standards; and

g. The Botanical Garden has multiple access barriers on the route accessing the Botanical Garden and within it, including not having directional signage to accessible routes, excessive slopes and cross-slopes, irregular pavement surfaces, pavement dislocation causing abrupt changes in level that exceed 1/2", pathways not maintained, and no paved or accessible routes.

### *New Construction and Alterations*

219. Upon information and belief, since January 26, 1992, Defendant has constructed and altered buildings and portions of the pedestrian right of way, including sidewalks, curb ramps, crosswalks, and other walkways, in a manner that does not comply with federal access standards thus rendering such facilities inaccessible to persons with mobility disabilities. Examples of such non-compliant construction and alterations include:

a. The construction or alteration of sidewalks that are too narrow or that have a cross slope in excess of 2% or a running slope in excess of 5%;

b. The construction or alteration of curb ramps that have a running slope that exceeds 8.33%, that lack a level landing of the required dimensions at the top or bottom of the ramp, or that fail to provide a flush transition from the base of the curb ramp to the crosswalk; and

c. The construction or alteration of crosswalks and curb ramps that lack a level transition to the crosswalk or that have a counter slope in excess of the maximum permitted of 5%.

**Failure to Maintain**

220.    Public entities are required to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities" under the ADA.  28 C.F.R. § 35.133(a). As the experiences of Plaintiffs demonstrate, Defendants have failed to comply with this requirement.

221.    On information and belief, Defendants lack policies and procedures to ensure that paths of travel at UCLA are regularly inspected for deteriorating conditions and the need for upkeep and barrier removal. As a result, paths of travel are generally ill-maintained and in various states of disrepair, causing dangerous conditions for Plaintiffs and others who use mobility aids and devices.

222.    On information and belief, it is the policy at UCLA to allow Facilities Management and other parties and/or contractors to regularly block accessible paths of travel during special events, such as sporting events and graduation ceremonies, for construction projects and for the campus' response to inclement weather. Defendants have not and do not consider disability access when implementing pedestrian traffic control measures and have failed to instruct and/or train their employees and contractors on how to avoid blocking accessible paths of travel on campus. Examples, taken from Jake's above-described experiences, include:

   a.  Crowd control barriers are regularly used around campus, and specifically on the sidewalk along the east side of Charles E. Young Drive West adjacent to Strauss Stadium, narrowing the path of travel to less than 36 inches in width and making it impossible for wheelchairs to pass.

   b.  Switchback paths in the Election Walk area that allow wheelchair access between the Student Activities Center, Kerckhoff Hall, Powell Library, and many academic buildings on the north side of campus (*e.g.*, Royce Hall, Haines Hall, and Rolfe Hall) are often blocked by crowd control

barriers when there are special events.

c. UCLA Facilities Management has used sandbags during periods of heavy rain that have completely blocked wheelchair access to the Mathematical Sciences Building with no alternative accessible route identified or provided.

d. Construction projects on campus frequently block off the accessible paths of travel to buildings with no alternative accessible route identified or provided.

223. Additionally, Defendants have failed to ensure that within buildings, accessible paths of travel are maintained. For example, from Jake's experiences:

a. Wheelchair access to the upper floors of Powell Library is frequently blocked due to the presence of furniture that blocks the wheelchair lift. Additionally, the lift itself appears ill-maintained and is marked as not self-operable, while there is no staff available to assist in the lift's operation.

b. Access to the elevator in Carnesale Commons, which is part of the only accessible route to dormitories in Sunset Village is frequently obstructed by a locked exterior door.

c. Elevators across campus—including the elevators near the Anderson School of Management, Strauss Stadium, and in Carnesale Commons— that are not properly maintained, and as a result, are repeatedly out of service.

d. Designated accessible doors to buildings on campus are often locked and unusable.

e. The mechanism that controls the automatic gate for the Sunset Recreation Family Pool has been in disrepair since Spring 2024, preventing wheelchair users from being able to independently enter and use the facilities.

**Failure to Provide Information / Signage**

224.   When not all facilities of a public entity are accessible, there is an obligation to provide people with disabilities "information as to the existence and location of accessible services, activities and facilities." *See* 28 C.F.R. 35.163(a). Additionally, public entities "shall provide signage at all inaccessible entrances to each of its facilities, directing users to an accessible entrance or to a location at which they can obtain information about accessible facilities." 28 C.F.R. 35.163(b); 1991 ADAAG 4.1.2(7)(c). Defendants have failed to comply with these requirements in a number of ways, as demonstrated by Plaintiffs' experiences. Specifically:

a.  UCLA does not have an accurate campus map that designates the locations of accessible entrances to buildings and classrooms or the accessible paths of travel between the accessible entrances/exits of buildings to connect various areas of campus. When Plaintiffs have asked Defendants' representatives for help identifying safe and accessible entrances to buildings and classrooms or accessible paths of travel on campus, Defendants' representatives have referred Plaintiffs to UCLA's "MetaMap," which does not address these basic access issues, admitted they does not know how to advise Plaintiffs, and/or provided Plaintiffs with inaccurate information, resulting in Plaintiffs being put in harm's way.

b.  UCLA's campus lacks adequate wayfinding signage to direct Plaintiffs and other students with mobility disabilities to the designated accessible elements of campus, including but not limited to a lack of accessible signage regarding accessible pedestrian paths of travel; accessible building and classroom entrances; elevators, lifts, and ramps; and parking.

c.  Multiple buildings on campus lack necessary and required signage to direct users to an accessible entrance or to accessible restroom facilities.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

d.  Signage in buildings directing people to accessible features is often wrong or confusing.

e.  Additionally, signage directing individuals to accessible restrooms within buildings, despite being required (2010 ADA Standard 216.8), is inadequate, in that it is either incorrect or non-existent.

f.  When elevators are down—which is a frequent occurrence for the elevators near the Anderson School of Management, Strauss Stadium, and in Carnesale Commons—Defendants do not alert disabled students of alternative accessible paths of travel; forcing them to take more dangerous routes to get to class or back to their dormitories.

**Failure to Make Reasonable Modifications**

225.    Under Title II public entities are obligated to make reasonable modifications[13] in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i). As illustrated by Plaintiffs' above-described experiences, Defendants have routinely failed to fulfill this obligation.

226.    Plaintiffs have complained to UCLA representatives numerous times about the plethora of access barriers they have encountered on campus that deny them meaningful access to—among other things—UCLA's academic programs, housing, recreational programs, transportation system, public rights of way, and emergency management services. Plaintiffs have also repeatedly requested reasonable accommodations to help them navigate around or avoid these access barriers. UCLA has denied, ignored, or significantly delayed the handling of these requests, denying

---

[13] In the context of the ADA and Section 504, "reasonable accommodation" and "reasonable modification" are often used interchangeably. For purposes of this complaint, the term "modification" will refer to a broader change that impacts more than one person while "accommodation" will be used to refer to a change for a particular individual. Note, in other contexts such as fair housing, the two terms have distinct definitions.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

Plaintiffs the ability to participate in and/or benefit from (and sometimes exclude their participation in) their services, programs, and activities and putting them at risk of harm.

227.    Contributing to, and perhaps explaining, UCLA's failure to reasonably accommodate, is the inefficiency of the CAE. CAE's stated mission is to create an accessible, inclusive, and supportive learning environment and facilitate academic accommodations, disability advocacy, and serve as an educational resource for the campus community. *See* "CAE's Mission" at https://cae.ucla.edu/. However, Plaintiffs experiences with CAE have been quite the opposite. The CAE is woefully understaffed. And as the experiences of Plaintiffs demonstrate, the limited staff that do exist have not been properly trained on how to ensure accessibility for disabled students.

228.    According to a Winter 2018 report of UCLA's "Student Affairs Information and Research Office" ("SAIRO"), approximately 15% of UCLA students reported having a disability. Of the 28,559 undergraduates surveyed by SAIRO, that represents approximately 4,280 UCLA undergraduates. Of these more than 4,000 disabled students, a vast majority are registered with the CAE. Yet, the CAE is grossly understaffed. Out of the nine total disability specialist positions CAE typically maintains, only three were filled at the start of the 2023-2024 academic year. *See* Samantha Parr, Mridhula Thyagarajan et al., *'It's Just a Fact': Understaffed CAE Office Fails to Meet Students' Needs*, DAILY BRUIN (Feb. 2, 2024), available at https://dailybruin.com/2024/02/02/its-just-a-fact-understaffed-cae-office-fails-to-meet-students-needs (last accessed Mar. 11, 2025). These three CAE disability specialists were responsible for serving 3,843 registered disabled students, resulting in a ratio of 1,281 students per specialist – 1,148 more than the national average of 133 students per disability specialist. *Id.*; *see also* Kristen R. Brown, Autumn K. Wilke et al., *Persuasive Metrics: Caseload Benchmarking and Data Driven Tools for Budgetary Advocacy*, 33(3) J POSTSECONDARY ED AND DISABILITY 291 (2020), available at https://files.eric.ed.gov/fulltext/EJ1280981.pdf.

229.    Also contributing to UCLA's failure to accommodate Plaintiffs is the lack of coordination between CAE and other departments. In Plaintiffs' experience, and as alleged herein, the approval and implementation of accommodations is often a multi-department affair. And these departments do not always communicate effectively, nor are they necessarily aware and informed as to what the other is doing. As a result, disabled students' needs are not timely or effectively met, if at all.

230.    The barriers alleged herein are listed without prejudice to Plaintiffs citing additional barriers to access by an amended complaint after a complete inspection by Plaintiffs' access consultant(s)/expert(s).

231.    The barriers alleged herein render the services, programs, and activities of UCLA inaccessible to Plaintiffs. Plaintiffs will continue to encounter these barriers as they finish their respective degrees. Plaintiffs will also encounter these barriers in the future when they return to UCLA to enjoy the services, programs, and activities available to them as alumni and members of the to the general public, and if Jake returns to UCLA as a graduate student.

232.    Defendants' program access obligations under Title II of the ADA are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

233.    Defendants have been provided actual notice of their failure to provide program access to Plaintiffs, the impact the lack of program access has had on Plaintiffs, and Defendants' duty to remediate their failures. Despite this knowledge, Defendants have failed and refused to take the steps necessary to address Plaintiffs' concerns or otherwise ensure services, programs, and activities comply with the requirements of the ADA. Defendants' failures in this regard constitute deliberate indifference.

234.    Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiffs pray for judgment as set forth below.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

### THIRD CAUSE OF ACTION:
### VIOLATION OF TITLE II OF THE ADA
### Failure to Provide Legally Compliant Paratransit Services
### [42 U.S.C. §§ 12132, 12143]
### *(Plaintiff Jake Bertellotti Against All Defendants)*

235.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

236.    Congress considered access to public transportation to be a critical means of achieving the goals of the ADA. As articulated by the House Committee on Education and Labor, "[t]ransportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. No. 101-485(II), at 37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 319.

237.    Recognizing the fundamental importance of transportation services and the lack of access to transportation encountered by persons with disabilities, Title II, Part B of the ADA requires public entities that provide fixed route public transportation services (including bus service) to provide paratransit service for individuals whose disabilities prevent them from using the fixed route system. 42 U.S.C. § 12143.

238.    A public entity discriminates against individuals with disabilities when it fails to provide them with paratransit service at a level of service comparable to the level of designated public transportation services provided to individuals without disabilities. 42 U.S.C. § 12143(a).

239.    The Department of Transportation ("DOT") regulations implementing the ADA's requirements relating to paratransit services set forth "[s]ervice criteria for complementary paratransit" which require that "[t]he entity shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day." 49 C.F.R. § 37.131(b).

240.    The DOT regulations also prohibit public entities from denying paratransit service to eligible persons based on "capacity constraints," stating, in pertinent part, as follows:

(f) Capacity constraints. The entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by any of the following:

. . . (3) Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons. 49 C.F.R. § 37.131(f)(3).

241.    According to the UCLA Transportation website, UCLA's complimentary paratransit service, BruinAccess, provides for "on-demand" rides, booked through the "TripShot" app. https://transportation.ucla.edu/getting-around-campus/bruinaccess. However, individuals who "require a vehicle equipped with a lift"—like Jake—or are "vision impaired" are instructed to reserve their ride through the BruinAccess office by emailing BruinAccess@ts.ucla.edu or calling (310) 825-2963 "at least 24 hours in advance."

242.    The reservation policies used by UCLA for BruinAccess violate the ADA on their face by requiring that reservations be made with 24-hour advance notice. Under the above-cited DOT regulations, UCLA is required to schedule and provide next day paratransit service to eligible students like Jake, even if the request for that service is less than 24-hours in advance.

243.    Additionally, UCLA has violated its duty to operate its paratransit system without capacity constraints. The reservation system for BruinAccess includes operational patterns or practices that significantly limit the availability of BruinAccess to ADA paratransit eligible persons. Individuals who require a vehicle equipped with a lift or who are blind or low vision are required to follow a different, more burdensome process for securing a BruinAccess ride than other eligible persons. They must email or call the BruinAccess office for reservations and must make such reservations at least 24-hours in advance.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

244.    Jake has been denied the ability to schedule a BruinAccess ride, despite his status as a wheelchair user. Jake has only been permitted to request on-demand services, and even then, has struggled with inconsistent and unreliable service. In several instances, he has been provided walking directions with no alternative way to schedule a shuttle or otherwise obtain transportation.

245.    Defendants' actions and omissions as herein alleged violate their duty to ensure that qualified individuals with a disability are not excluded from participation in or denied the benefits of its public transit services. 42. U.S.C. § 12132.

246.    Defendants' acts and omissions as herein alleged violate their duty to provide paratransit service to any individual who is unable, as a result of a physical or mental disability, to use its fixed route system. 42 U.S.C. § 12143(c).

247.    Defendants' acts and omissions as herein alleged violate their duty to provide paratransit services at a level of service which is comparable to the level of public transit services offered to persons without disabilities, 42 U.S.C. § 12143(a)(1), and their duty to provide next-day service, 49 C.F.R. § 37.131(b).

248.    Defendants' actions and omissions as herein alleged violate their duty under the ADA and implementing regulations to operate the paratransit service without capacity constraints that significantly limit the availability of paratransit service for eligible riders. 49 C.F.R. § 37.131(f).

249.    Defendants' duties under Title II of the ADA pertaining to the provision of paratransit services are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

250.    Defendants have been provided actual notice of the issues with its paratransit services, the impact the issues have had on Jake, and their duty to remediate such issues under Title II of the ADA. Despite this knowledge, Defendants have failed

and refused to take any steps to address Jake's concerns or otherwise ensure its paratransit services comply with the requirements of the ADA. Defendants' failures in this regard constitute deliberate indifference.

251.   Pursuant to 42 U.S.C. §§ 12133 and 12205, Jake prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION:
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
## [29 U.S.C. § 794]
### *(Against All Defendants)*

252.   Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

253.   Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

254.   Plaintiffs are, and at all times relevant herein were, individuals with "disabilities" within the meaning of Section 504. 29 U.S.C. § 705(9).

255.   The term "program or activity," for purposes of Section 504, includes "a college, university, or other postsecondary institution, or a public system of higher education." 34 C.F.R. § 104.3(k)(2)(i). Thus, it includes UCLA.

256.   Upon information and belief, at all times relevant to this action, Defendants were recipients of "federal financial assistance" for the benefit and use of UCLA, including a variety of grants, loans, and contracts from the Department of Education ("DOE"). *See* 34 C.F.R. § 104.3(h). Thus, Defendants are, and at all times relevant herein were, subject to the requirements of Section 504 and its implementing DOE regulations.

257. The Defendants' acts and omissions as herein alleged have excluded and/or denied Plaintiffs the benefit of and/or participation in the programs and activities offered by Defendants, in violation of Section 504 and its implementing DOE regulations. Defendants discrimination includes the failure to:

    a. operate their program or activity so that when each part is viewed in its entirety, it is readily accessible to disabled people, 34 C.F.R. 104.22(a);

    b. adopt and implement procedures to ensure that interested persons; including persons with impaired vision or hearing, can obtain information as to the existence and location of services, activities, and facilities that are accessible to and useable by disabled people, 34 C.F.R. 104.22(f);

    c. design and construct each facility or part of a facility in such manner that the facility or part of the facility is readily accessible to and usable by disabled people, 34 C.F.R. 104.23(a); and

    d. make alterations that affect or could affect the usability of a facility or part of a facility readily accessible to and usable by handicapped persons to the maximum extent feasible, 34 C.F.R. 104.23(b).

258. Upon information and belief, at all times relevant to this action, Defendants were also recipients of "federal financial assistance" for the benefit and use of UCLA, including a variety of grants, loans and contracts from the Department of Transportation ("DOT"). *See* 49 C.F.R. § 27.5. Thus, Defendants are, and at all times relevant herein were, also required to operate their paratransit service (BruinAccess) in compliance with all requirements of the ADA. 49 C.F.R. § 27.19.

259. Defendants are, and at all times relevant herein were, subject to the requirements of Section 504 and implementing DOJ regulations. As described in detail above, Defendants' acts and omissions as herein alleged have excluded and/or denied Plaintiffs the benefit of and/or participation in the programs and activities offered by Defendants, in violation of Section 504 and implementing DOJ regulations.

260.    The rights and obligations established by the ADA mirror those under Section 504, and the two laws are applied co-extensively. As alleged above, Defendants have violated Plaintiffs' rights under the ADA. Based on the same facts, Defendants has violated Section 504 of the Rehabilitation Act.

261.    Defendants' duties under Section 504 are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

262.    Defendants have been provided actual notice of the access barriers and discrimination experienced by Plaintiffs, the impact the access barriers and discrimination have had on Plaintiffs, and their duty to remediate such barriers and discrimination under Section 504 and its implementing regulations. Despite this knowledge, Defendants have failed and refused to take any steps to address Plaintiffs' concerns or otherwise ensure that the programs and activities at UCLA comply with the requirements of Section 504 and its implementing regulations. Defendants' failures in this regard constitute deliberate indifference.

263.    Pursuant to 29 U.S.C. § 794a, Plaintiffs pray for judgment as set forth below.

**FIFTH CAUSE OF ACTION:**
**VIOLATION OF THE FAIR HOUSING AMENDMENTS ACT**
**[42 U.S.C. §§ 3601, *et seq.*]**
***(Against All Defendants)***

264.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

265.    The Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.*, prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions, based on a number of protected characteristics, including disability.

266.   Plaintiffs are, and at all times relevant herein were, individuals with disabilities as that term is defined by the FHAA and its implementing regulations. 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201.

267.   Defendants are, and at all times relevant herein were "persons" engaging in the "rental" of "dwellings," as those termed as defined by the FHAA and its implementing regulations. 42 U.S.C. § 3602(b), (d), and (e); 24 C.F.R. §§ 100.20 and 100.201.

268.   The student dormitories where Plaintiffs reside, are "covered multi-family dwellings" and "dwellings" available "to rent" within the meaning of the Fair Housing Amendments Act ("FHAA"). 42 U.S.C.A. §§ 3602; 3604 (f)(7)(A).

269.   On information and belief, some dormitories at UCLA have been designed and constructed for first occupancy after March 13, 1991. The FHAA requires that covered multifamily dwellings be designed and constructed with a number of accessible features, including:

   a.  The public and common use areas must be readily accessible to and usable by persons with disabilities;

   b.  All doors designed to allow passage into and within all premises of covered dwellings must be sufficiently wide to allow passage by persons with disabilities, including persons who use wheelchairs;

   c.  All premises within covered dwellings must contain the following features:

      i.    An accessible route into and through the dwelling unit;
      ii.   Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
      iii.  Reinforcements in bathroom walls to allow the later installation of grab bars;
      iv.   Usable kitchens and bathrooms such that an individual using a wheelchair can maneuver about and use the space.

*See* 42 U.S.C. § 3604(f)(3)(C). On information and belief, Defendants have failed to comply with these requirements and have no policies or procedures in place to comply

with these requirements. For example, on information and belief, Defendants' newly constructed dormitories:

a. Lack accessible entrances;

b. Lack accessible features in designated accessible units, such as grab bars in showers; and

c. Lack accessible and useable common use areas.

270. The FHAA also requires that housing providers make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § 100.204.

271. On information and belief, Defendants lack policies and procedures for maintaining accessible features in UCLA's housing. For example, elevators that are part of the accessible route for dormitories are frequently obstructed and not consistently maintained in operable condition.

272. Additionally, as alleged herein, Plaintiffs requested reasonable accommodations related to their ability to use and enjoy the housing at UCLA on numerous occasions, only to have those requests unduly delayed, denied, or ignored.

273. In acting as herein alleged, Defendants have injured Plaintiffs by committing discriminatory housing practices, impacting their use and enjoyment of UCLA's housing in violation of the FHAA. Plaintiffs are "aggrieved" persons within the meaning of the FHAA. 42 U.S.C. § 3602(i)(1); 24 C.F.R. § 100.201.

274. Defendants' duties under the FHAA are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

275. Defendants have been provided actual notice of the access barriers and discrimination experienced by Plaintiffs related to their housing, the impact the access barriers and discrimination have had on Plaintiffs, and their duty to remediate such

barriers and discrimination under the FHAA and its implementing regulations. Despite this knowledge, Defendants have failed and refused to take any steps to address Plaintiffs' concerns or otherwise ensure that the housing services, programs, and activities at UCLA comply with the requirements of the FHAA and its implementing regulations. Defendants' failures in this regard constitute deliberate indifference.

276.    Pursuant to 42 U.S.C. § 3613(c)(1) and (2), Plaintiffs pray for judgment as set forth below.

## SIXTH CAUSE OF ACTION:
## VIOLATION OF CALIFORNIA GOVERNMENT CODE 11135
### [Cal. Gov't. Code, § 11135]
### *(Against All Defendants)*

277.    Plaintiffs replead and incorporate by reference the allegations contained in each of the foregoing paragraphs.

278.    Section 11135(a) of the California Government Code provides in pertinent part: "No person in the State of California shall, on the basis of ... disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is funded directly by the state or receives any financial assistance from the state."

279.    Defendants' above-described programs and activities are funded directly by the State of California and/or receive financial assistance from the State of California.

280.    In acting as herein alleged, Defendants have denied Plaintiffs the benefits of the State funded and/or assisted programs and activities provided by at through UCLA, and/or subjected Plaintiffs to unlawful discrimination based on their disabilities, in violation of Government Code section 11135.

281.    California Government Code section 11135(b) incorporates the protections and prohibitions contained in the ADA and its implementing regulations. For all of the reasons outlined above under Plaintiffs' First, Second, and Third Causes of Action,

Defendants have violated and continue to violate the ADA and therefore have violated
and continue to violate California Government Code section 11135(b).

282.    Pursuant to California Government Code section 11139, Plaintiffs have a
private right of action to enforce California Government Code section 11135(b).

283.    Pursuant to California Government Code section 11139, Plaintiffs pray for
judgment as set forth below.

### SEVENTH CAUSE OF ACTION:
**VIOLATION OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT**
**California Civil Code §12955 *et seq*.**
***(Against All Defendants)***

284.    Plaintiffs re-plead and incorporate by reference the allegations contained in
each of the foregoing paragraphs.

285.    The California Fair Employment and Housing Act ("FEHA"), Cal. Gov.
Code §12955 *et seq*. prohibits discrimination in the sale, rental, and financing of
dwellings, and in other housing-related transactions, based on a number of protected
characteristics, including disability.

286.    The FEHA was written to conform California law on the subject of fair
housing to the Federal Fair Housing Act. *Broodmore San Clemente Homeowners' Assn.
v. Nelson*, 30 Cal.Rptr.2d 318-320 (Cal. Dist. Ct. App. 1994). Accordingly, an analysis
under the FEHA mirrors an analysis under the FHAA.

287.    Plaintiffs are, and at all times relevant herein were, individuals with
disabilities as that term is defined by California law. Cal. Gov. Code § 12926.

288.    Defendants are, and at all times relevant herein were, "owners" of
"housing accommodations" within the meaning of the FEHA. Cal. Gov't Code §§
12927(d) and (e). Each of the Defendants is also a "person" as defined under FEHA.
Cal. Gov't Code § 12927(f).

77
COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

289.    Under the FEHA, it is discriminatory for a housing provider to refuse to make reasonable accommodations where necessary to afford an individual with a disability an equal opportunity to use and enjoy a dwelling unit and public and common use areas, or an equal opportunity to obtain, use, or enjoy a housing opportunity. Cal. Code Regs. Tit. 2, § 12176(a) and (c).

290.    In the case of housing provided by a public university such as UCLA, reasonable modifications necessary for disabled individual to use and enjoy a dwelling unit and public and common use areas, or an equal opportunity to obtain, use, or enjoy a housing opportunity, are treated like reasonable accommodations and must be paid for by the university. *See* Cal. Code Regs. Tit. 2, § 12181(h). A reasonable modification is a change, alteration or addition to the physical premises of an existing housing accommodation, when such a modification may be necessary to afford the individual with a disability an equal opportunity to use and enjoy a dwelling unit and public and common use areas, or an equal opportunity to obtain, use, or enjoy a housing opportunity. Cal. Code Regs. Tit. 2 § 12176.

291.    Under the FEHA, it is discriminatory for a housing provider to refuse or fail to engage in an interactive process regarding a tenant's reasonable accommodation or reasonable modification requests. Cal. Code Regs. Tit. 2, § 12177.

292.    In acting as alleged herein, Defendants have injured Plaintiffs by committing discriminatory housing practices in violation of these above-mentioned provisions of FEHA.

293.    Plaintiffs are "aggrieved" persons within the meaning of the FEHA. Cal. Gov't Code § 12927(g). Plaintiffs have been denied reasonable accommodations for their disabilities, impacting their use and enjoyment of their housing.

294.    Defendants' duties under the FEHA are mandatory and long-established. Defendants had knowledge of their duties at all times relevant herein; their failure to carry out said duties as alleged herein was a willful and knowing decision and choice and/or the product of deliberate indifference.

295.    Defendants have been provided actual notice of the access barriers and discrimination experienced by Plaintiffs related to their housing, the impact the access barriers and discrimination have had on Plaintiffs, and their duty to remediate such barriers and discrimination under the FEHA and its implementing regulations. Despite this knowledge, Defendants have failed and refused to take any steps to address Plaintiffs' concerns or otherwise ensure that the housing services, programs, and activities at UCLA comply with the requirements of the FEHA and its implementing regulations. Defendants' failures in this regard constitute deliberate indifference.

296.    Pursuant to Cal. v. Code § 12989.2, Plaintiffs pray for judgment as set forth below.

**PRAYER FOR RELIEF**

Plaintiffs have no adequate remedy at law to redress the wrongs suffered as stated in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury because of the unlawful acts, omissions, policies, and practices of Defendants as alleged herein, unless Plaintiffs are granted the relief they request. Plaintiffs and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the laws of the United States and the State of California.

WHEREFORE, Plaintiffs pray for judgment and the following specific relief against Defendants:

1. Issue a declaratory judgment that Defendants' conduct has violated, and continues to violate, Title II of the ADA, Section 504, FHAA, California Government Code 11135, and FEHA;

2. Issue an injunction directing Defendants to:

a. Take the steps necessary to ensure that the emergency management services, programs, and activities at UCLA are readily accessible to and useable by Plaintiffs. This will include, **at a minimum**, that Defendants:

    i. Retain an expert on emergency planning for disabled people in a higher education setting; and

    ii. Develop and implement campus-wide emergency management plans that consider and address the needs of individual with disabilities in all residential, academic, social, and recreational settings and facilities;

b. Take the steps necessary to ensure that the services, programs, and activities of UCLA—including its academic programs, housing, recreational programs, and public rights of way—are readily accessible to and useable by Plaintiffs when looked at in their entirety, and that Plaintiffs are not excluded from participating in, or denied the benefits of the services, programs, and activities of UCLA on the basis on their mobility disabilities moving forward. This will include, **at a minimum**, that Defendants:

    i. Retain an expert(s) to conduct an ADA self-evaluation pursuant to 28 C.F.R. § 35.105;

    ii. Develop an ADA transition plan pursuant to 28 C.F.R. § 35.150(d);

    iii. Submit their employees and agents to training on the rights of students with disabilities;

    iv. Expand the staffing of the CAE to meet—or come close to— the national average of 133 students per disability specialist to better service to disabled students; and

    v. Modify their policies and procedures so that requests for reasonable accommodations are more efficiently tracked by CAE, even when requiring inter-departmental coordination, and that CAE assume

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

ultimate responsibility for the provision (or denial) of reasonable accommodations for disabled students;

c. Take the steps necessary to ensure that the paratransit services, programs, and activities of UCLA are readily accessible to and useable by Plaintiffs, and that Plaintiffs are not excluded from participating in or denied the benefits of BruinAccess on the basis on their mobility disabilities moving forward. This will include, **at a minimum**, that Defendants:

   i. Modify the policies for BruinAccess to ensure the provision of next-day service;

   ii. Modify the policies for BruinAccess to discontinue the requirement that individuals requiring a vehicle equipped with a lift or who are blind or low vision follow a different, more burdensome process for securing a BruinAccess ride than other eligible persons; and

   iii. Retain an expert to review and assess the operation of BruinAccess for capacity constraints that significantly limit the availability of paratransit service for eligible riders, and take action to remediate those capacity constraints;

3. Retain jurisdiction over Defendants until the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions, and maintenance of physically inaccessible public facilities and policies as complained of here no longer occur and cannot recur;

4. Award to Plaintiffs all appropriate damages, including, but not limited to, statutory damages, general damages, treble damages, and punitive damages, in amounts within the jurisdiction of the Court, all according to proof;

5. Award to Plaintiffs attorney fees, litigation expenses, and costs of this proceeding;

6. Award pre- and post-judgment interest as permitted by law; and

7. Grant any other relief that this Court may deem just and proper.

COMPLAINT AND JURY DEMAND
*BERTELOTTI ET AL. V. REGENTS OF THE UNIVERSITY OF CALIFORNIA*

Date: April 8, 2025

PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP

*/s/ Catherine Cabalo*
By: CATHERINE CABALO, Esq.
Attorneys for Plaintiffs

Date: April 8, 2025

DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND

*/s/ Michelle Uzeta*
By: MICHELLE UZETA, Esq.
Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims for which a jury is permitted.

Date: April 8, 2025

PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP

*/s/ Catherine Cabalo*
By: CATHERINE CABALO, Esq.
Attorneys for Plaintiffs

Date: April 8, 2025

DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND

*/s/ Michelle Uzeta*
By: MICHELLE UZETA, Esq.
Attorneys for Plaintiffs